Ricardo **MUNOZ**, Plaintiff,

v.

**EXPEDITED FREIGHT SYSTEMS, INC.,** Defendant.

No. 89 C 3700.

United States District Court, N.D. Illinois, E.D.

Oct. 24, 1991.

**1182**

Mary Rose Strubbe, Kevin M. Kane, Brigham, Kane & Strubbe, Waukegan, Ill., for plaintiff.

Richard F. Zehnle, Diane Marie Kehl, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Monica Rimai, Bruce A. McIlnay, Minahan & Peterson, S.C., Milwaukee, Wis., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

JOAN HUMPHREY LEFKOW, United States Magistrate Judge:

This action for breach of an employment contract is pending for a determination of appropriate relief after the court entered summary judgment in favor of plaintiff, Ricardo Munoz, on liability issues. The liability of defendant, Expedited Freight Systems, Inc. ("EFS"), was determined in a Memorandum Opinion dated July 20, 1990 on the basis that EFS's employee handbook constituted a binding contract and that defendant breached the contract by failing to follow specific disciplinary procedures contained in the handbook. The damages issues were tried to the court in a one-day hearing. Based on the evidence received, the proposed Findings of Fact and Conclusions of Law submitted by the parties as well as arguments of counsel made in post-trial memoranda, the court enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff, Ricardo Munoz, is a citizen of Illinois who resides in this judicial district.

2. Defendant, Expedited Freight Systems, Inc. ("EFS"), is a Wisconsin corporation with its principal place of business in Wisconsin.

3. Munoz was an employee of EFS. Throughout his employment, Munoz worked at an EFS facility located in Des Plaines, Illinois. That facility is now closed.

4. Prior to his employment at EFS, Munoz had worked in the transportation industry since he graduated from high school in 1972. He worked at Motor Express of Indiana for 13 years, having begun as a dock worker. There he was promoted a number of times, to an office position dealing with accounts receivable, then to office manager, then to dispatcher/evening operations, and finally to the position of central dispatcher, organization/superintendent of maintenance. In his last position with Motor Express of Indiana he was earning about $40,000 annually.

5. From there he was recruited by a former co-worker, Jeff Stempien, to work for EFS. The president of EFS, Thomas Kurgan, offered him the position of systems operation manager at a salary of $43,000 plus a $1,000 "signing bonus", to begin in June, 1986.

6. Munoz's duties at EFS included "oversight of systems operations" and management of EFS's terminal at Des Plaines. At the time he was hired, Munoz reported to Stempien and Kurgan.

7. Munoz received annual raises in June, 1987 and June, 1988. In June, 1988, his salary was increased to $47,880 annually.

8. In addition to his salary, Munoz received a monthly bonus based on EFS's profitability. The bonus arrangement began in June, 1988. Plaintiff's total bonus for the period June through December, 1988 was $1,969. The monthly average was $281.

9. Munoz also received health insurance coverage for himself and his family, as well as life insurance. The cost of the health insurance to Munoz was $139.64 per month for continued coverage under COBRA.

10. He also had the use of a company car which he valued at approximately $200 a month.

11. In January, 1988, EFS replaced Stempien with Tony Van Der Wielen, Executive Vice–President. (Van Der Wielen left EFS in mid–1989 for reasons not of record.) Munoz then reported to Van Der Wielen and Kurgan. At this time, EFS also hired a friend of Munoz's named Richard Koenig to take over terminal manager duties that had previously been under Munoz's responsibility. Koenig reported to Munoz.

12. In April, 1988, EFS offered Munoz's job to Koenig and indicated to him that Munoz would be demoted to Koenig's job. Apparently because of his discomfort with being promoted over his friend and supervisor, Koenig soon left EFS. Munoz had contemporaneous knowledge of this offer, although he testified that Van Der Wielen told him to forget about it. He also received an annual salary increase after this occurred.

13. Koenig testified that he believed Munoz was "very in tune" with his position at EFS and that the problems at EFS were attributable to other persons, particularly Stempien.

14. In approximately September, 1988, EFS promoted James Packee to regional vice-president and located him at the Des Plaines terminal with Munoz. At that time, EFS's terminal manager was Rich Nichols. Packee has since resumed an earlier position of sales representative.

15. Munoz and Nichols had difficulty fulfilling Van Der Wielen's and Packee's expectations. Van Der Wielen, Kurgan and Packee testified that there were a number of meetings at which these problems were discussed. At one meeting, Kurgan told Nichols and Munoz that they must either resolve their differences with Van Der Wielen or leave. Packee testified that Nichols and Munoz came to him with their dissatisfaction with Van Der Wielen and Kurgan, and in the fall of 1988 they threatened to quit. Munoz, however, denied these particular incidents and denied statements that he had allegedly made criticizing Van Der Wielen and Kurgan. He testified that Packee might have misunderstood him but that Van Der Wielen was lying.

16. During December, 1988, Van Der Wielen telephoned Munoz about a problem and at the end of the conversation told Munoz to go home "and think it over". Munoz did not go home, however, and at about 2:00 that afternoon telephoned Van Der Wielen and told him that he had not left. Van Der Wielen testified that Munoz said that if EFS was dissatisfied with him, he should be fired rather than suspended. Van Der Wielen believed at that time that Munoz understood that EFS was dissatisfied with his job performance. Munoz denied that this incident occurred.

17. Kurgan testified that at some time during 1988 he had a conversation with Munoz in which Kurgan warned Munoz that Munoz was "asking" to be fired. This incident concerned Munoz's failure to locate a facility in Grand Rapids as he had been directed to do.

18. Kurgan testified that he believed in January, 1989, that Munoz was not capable of handling the position assigned to him. Munoz stated that although Kurgan criticized him from time to time, he never understood that his job was in jeopardy.

19. Van Der Wielen testified that Munoz told him in the fall of 1988 that Kurgan questioned his judgment and integrity and was concerned about his future with the company. Munoz also denied that he made any statements to this effect.

20. On January 20, 1989, Munoz was called to Milwaukee to meet with Van Der Wielen. Van Der Wielen told Munoz that he was being fired. In notes that Van Der Wielen made of that interview, he wrote that Munoz "indicated he had been frustrated on the job for over a year", that he "couldn't get the job done Tom [Kurgan]'s way," that he "couldn't change his personality to be more aggressive" and that he

"threw the towel in a long time ago". Van Der Wielen also noted that Munoz had admitted that Van Der Wielen had warned of this action on several occasions. Munoz denied all of these statements.

21. Lorie Munoz, plaintiff's wife, testified that her husband expressed shock when he was fired and indicated that he could not understand the reasons.

22. As of January 1, 1990, EFS closed its terminal in Des Plaines and consolidated the business of its Milwaukee and Des Plaines terminals in Kenosha, Wisconsin. EFS's consolidation was not motivated by Munoz's legal action against the company. As a result of the consolidation, however, Munoz's former position at EFS was eliminated. Nevertheless, EFS's president, Kurgan, testified that there are now two persons functioning as systems operations directors which is approximately the same position Munoz held. Kurgan also testified that all employees in the closed facilities were invited to move to Kenosha.

23. It is stipulated that after he was fired, Munoz diligently searched for comparable employment. While seeking full-time employment, he did casual dock labor at Preston Trucking Company, working for Rich Koenig, whom Munoz had supervised at EFS. There he earned $3,468.80 in 1989.

24. In May, 1989, a dock coordinator position became available at Preston on the 11:00 p.m. to 7:00 a.m. shift. The salary range of that job was considerably lower than Munoz had been earning, about $32,000–$35,000 annually. Health insurance benefits would also have been provided, but no car or bonus plan was included. The managerial level of this position was considerably lower than the position Munoz had held at EFS.

25. Whether or not the job was actually offered is a point in dispute. At Munoz's deposition, he testified that he had been offered the job but turned it down. He also stated that he had rejected an offer of employment from Preston in answers to interrogatories, stating, "It would require him to work nights and because it paid so much less than his position with EFS had." At trial, however, Munoz denied receiving an actual offer from Preston. His friend, Koenig, also testified that the offer had never been formally made because Munoz was unwilling to promise that he would transfer anywhere in the country if promoted.

26. Munoz continued to look for a comparable position without success. By late July, he began to help his father-in-law and brother-in-law in a fledgling painting business. In approximately August or September, Munoz made a decision to quit looking for work in the transportation industry and to work at building the family painting business.

27. Munoz reported an income of $2,500 in 1989 from the painting business on his tax return for that year. He reported in answers to interrogatories, however, that he had earned approximately $300 a week from mid-July to the end of 1989, and in an affidavit dated February 24, 1990, Munoz indicated that he had earned approximately $7,000 as a house painter during 1989 ($300 × 23.3 weeks). Munoz attributes the discrepancy between his tax return and the affidavit to deduction of expenses.

28. Munoz also earned accumulated and unused vacation pay from EFS in 1989 in the amount of $10,052.46.

29. Munoz's 1990 earnings from the painting business were $28,800 through the date of trial, October 12, 1990.

30. Munoz testified that he wants to return to EFS and would move to Wisconsin if reinstated.

## CONCLUSIONS OF FACT AND LAW

Plaintiff claims damages in the amount of $54,988.04, calculated on the basis of lost wages and benefits (including insurance and company car) from the date of termination to the date of trial, less earnings from other sources. He also claims he is entitled to reinstatement. Plaintiff believes evidence that he would have been discharged even if EFS had followed its employee handbook is inadmissible to rebut plaintiff's proof of damages.

Defendant contends that plaintiff is entitled only to nominal damages because he

has suffered no loss as a proximate result of its failure to follow the procedures for progressive discipline provided in its employee handbook.[1] Indeed, EFS contends, plaintiff received warnings that his job was in jeopardy sufficient to put him on notice that he must improve his performance or be discharged. EFS believes this is the substantial equivalent of compliance with the procedures provided in the handbook. In substance, EFS argues that plaintiff would have been fired on January 20, 1989 even if it had followed the handbook, so to compensate him for lost earnings after that date would be unjust. EFS does not believe plaintiff is entitled to be reinstated.[2]

*Damages*

■ Both parties rely, *inter alia*, on *Feldstein v. Guinan*, 148 Ill.App.3d 610, 101 Ill.Dec. 947, 499 N.E.2d 535 (1st Dist. 1986), for the proper measure of damages. There the court stated, "The proper measure of damages when an employee has been wrongfully discharged is the agreed wages during the contract term, reduced by wages earned during the same period and which could not have been earned in the same employment." *Id.* at 613, 101 Ill.Dec. at 950, 499 N.E.2d at 538 (citing *People ex rel. Bourne v. Johnson*, 32 Ill.2d 324, 205 N.E.2d 470 (1965)). The value of fringe benefits is also awardable damages for breach of employment contract. *Schwarze v. Solo Cup Co.*, 112 Ill.App.3d 632, 68 Ill.Dec. 228, 445 N.E.2d 872 (2d Dist.1983). The parties do not disagree about the rule of law but rather the application of it in a case where, unlike *Feldstein*, there was no agreed contract term but an "at will" employment relationship which the employer could have terminated at any time.

The at will doctrine, in fact, developed around the dilemma caused by claims which sought recovery for damages under an employment contract for an indefinite term. The history of the doctrine is discussed in Lex K. Larson's treatise, *Unjust Dismissal* (1991) ("Larson"). In brief, the British rule contained a presumption that an employment contract for an indefinite term was for the term of one year. The presumption could be rebutted by an agreement to the contrary, for which the employer had the burden of proof. *Id.* § 2.02 at 2–2 and 2–3. The proper measure of damages under this rule was wages until the end of the (presumed or otherwise agreed) term. *See id.* at 2–3 and 2–4. The American courts rejected the British rule's presumption and instead evaluated the term of an indeterminate contract based on the surrounding circumstances. *See id.* § 2.03. Later this evolved into a presumption that an employment contract for an unstated term was terminable at will by either party. *Id.* § 2.04 at 2–6.[3] An employee who was discharged was entitled to wages only

1. As set out in this court's decision granting summary judgment, the handbook provided the following procedures:

    Violations of work rules and regulations covered within the Employee Handbook shall be subject to the following disciplinary procedures:
    1) FIRST OFFENSE—Verbal warning
    2) SECOND OFFENSE—Written warning
    3) THIRD OFFENSE—Suspension and counseling
    4) FOURTH OFFENSE—Termination of Employment

    It was uncontroverted for purposes of the summary judgment motion that Munoz received several reprimanding memoranda regarding job performance deficiencies, including two in January, 1989; and that Munoz was fired for failure or refusal to follow the instructions of supervision and unsatisfactory job performance. Memorandum Opinion of July 20, 1990 at 2–3.

2. The ruling on plaintiff's motion for summary judgment did not explicitly find that the court has jurisdiction of the subject matter. It does. The parties are citizens of different states and the amount in controversy was alleged in good faith to exceed $50,000. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (The rule governing dismissal for want of jurisdiction is that the sum claimed by plaintiff controls if the claim is apparently made in good faith). Venue is proper in this district because the events giving rise to the lawsuit occurred in this district. *See* 28 U.S.C. § 1391(a)(2). It is also noted that the parties have consented to disposition of this case by a United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c).

3. As explained by Larson, the American rule was "invented" by Horace Wood who authored *A Treatise on the Law of Master and Servant* (1877), in which he stated:

    With us, the rule is inflexible that a general or indefinite hiring is *prima facie* a hiring at-will, and if the servant seeks to make it out a

through the date of his discharge. *See Kendall v. West*, 196 Ill. 221, 63 N.E. 683 (1902) (if employee's services were not satisfactory, employer had right to dispense with them without further liability for the unexecuted portion thereof).

In Illinois, cases deciding damages for breach of employment contract do not follow a single course, but the supreme court has held in cases involving contracts for a specific term that a plaintiff is precluded from recovering damages beyond the date of trial on the basis that such damages are speculative. *E.g., Mount Hope Cemetery Ass'n v. Weidenman*, 139 Ill. 67, 28 N.E. 834 (1891).[4] The general reasoning is that

yearly hiring, the burden is upon him to establish it by proof.
1 Larson § 2.04 at 2–6 (1991) (quoting Wood, § 134 at 272). For this proposition, Wood cited six cases, four American and two Scotch, none of which supported his proposition. *Id.* at 2–10 n. 16. Wood's treatise was so often cited that even the courts which acknowledged that Wood's original proposition was insupportable, found there to be "respectable authority" for the American rule. *Id.* at 2–10, (quoting *Putnam v. Producers' Live Stock Mktg. Ass'n.*, 256 Ky. 196, 75 S.W.2d 1075 (1934)). The historical development of the at will doctrine in Illinois parallels this. Many cases are cited for or, in fact, recite the platitudes of the at will employment doctrine without examining the legitimacy of its origin. For example, in *Kendall v. West*, 196 Ill. 221, 63 N.E. 683 (1902), the court cited *Goodrich v. Van Nortwick*, 43 Ill. 445 (1867) and *Crawford v. Mail & Express Pub. Co.*, 163 N.Y. 404, 57 N.E. 616 (1900), for the proposition that an employee could be discharged at any time for any reason in the employer's sole discretion. *Goodrich* and *Crawford*, however, both concerned the right to reject unsatisfactory goods.

**4.** The evolution of this doctrine is traced from *Hamlin, Hale & Co. v. Race*, 78 Ill. 422 (1875), where an employee was dismissed part way through his one-year term. The employee sued prior to the expiration of the term for all the wages that would have come due during the balance of the term. Although trial was had after the term expired, the court held that the employer was only entitled to recover those sums which had become due at the time suit was initiated. Analogizing the employment contract to an installment contract, where monies only become due as each installment falls due, the court ruled, "We have supposed no rule was more inflexible or better established than that a plaintiff can not recover for money not due at the institution of the suit." *Id.* at 425. The employee had sued *in assumpsit*, not for breach of contract. In *dicta*, the court however noted that had the employee sued for breach of contract, "it may be that he could have recovered for all the damage he sustained during the year by the breach of the contract, if the trial was had after its expiration." *Id.* at 426. By either course, a plaintiff would eventually be able to collect his entire loss.

A similar circumstance was presented in *Mt. Hope*. An employee had a five-year employment contract for which he was to be paid in monthly installments. The employee was discharged after working for seven and one-half months. Concurring with the *dicta* in *Hamlin*, the court stated,

> If he sued before the termination of the contract, and the action was not tried until after the period of service stipulated for had expired, the plaintiff would be entitled to recover for the whole time, less payments made, and such sum as he had, or might by reasonable diligence have, earned subsequent to the breach.

*Id.* 139 Ill. at 77–78, 28 N.E. at 835–36 (citations omitted). But because plaintiff had brought suit and the case had been tried before expiration of the contract term, the court held that "the recovery is limited to damages sustained to the time of trial" because further damages are speculative. *Id.*

Citing Wood's treatise,

> In view of the fact that the servant may die or become incapable of performing before the expiration of the term of his employment, and the uncertainty of the wages or emoluments, he may be enabled to earn in the future, we are disposed to follow the rule that the plaintiff should be limited to his actual loss at the time of trial.... By the adoption of the rule limiting recovery to the day of trial all difficulty would be avoided in the assessment of his damages. There is no hardship in this, for, as we have seen, if he desires so to do he may lie by until the expiration of the term.

*Id.* at 79, 28 N.E. at 836. Thus, a plaintiff's damages were fully collectable only if he sued periodically or if the trial occurred after expiration of the contract term.

But in *Doherty v. Schipper & Block*, 250 Ill. 128, 95 N.E. 74 (1911), the court applied the rule against splitting a cause of action to bar plaintiff employee from recovering her full contract remedy. There the employee was discharged after serving nine weeks of an 18–week contract. At the end of the tenth week she sued and recovered one week's wages. In a second suit she recovered the balance that would have come due during the eight weeks remaining in the term. The court implicitly rejected *Hamlin* and *Mt. Hope* to the extent those cases permitted suits for installments of wages and held that the first suit barred the second. In explaining why damages to the end of the term could not be awarded, the court reasoned,

> We think the doctrine of constructive service ["... that a discharged employee holding himself ready to do the work has therefore done

determination of plaintiff's future earnings (whether he would live, what his future earnings would be) is too difficult to ascertain. *Id.* at 79, 28 N.E. at 836.[5] But as long as the case is tried after the term expires plaintiff is entitled to his full contract damages even if they cannot be established with certainty. For example, in *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 115 N.E. 389 (1917), the court approved basing the damage award on plaintiff's past earnings (commissions) as a measure of future damages to the expiration of the contract. The court stated, "[t]hat proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." *Id.* at 289, 115 N.E. at 390 (citations omitted).

Munoz does not contend that he is entitled to damages beyond the date of trial, although that rule of law is subject to criticism.[6] The proposition plaintiff advances here is that he is *entitled* to damages to the date of trial even if it can be postulated that, because he was an at will employee, the employer might have discharged him at any time before the date of trial. The cases imposing this limit, however, did not concern at will employment contracts but rather contracts for a definite term. Because *Kendall* has never been overruled, EFS's position might be well taken. More recent cases, however, indicate that the courts have not taken such a harsh stance towards employees in this situation. For example, in *Redemske v. Romeoville*, 85 Ill.App.3d 286, 40 Ill.Dec. 596, 406 N.E.2d 602 (3d Dist.1980), plaintiff sued for wrongful discharge after being fired for riding in a political parade within the village limits, an act her employer believed contrary to a local ordinance. The court affirmed the judgment of wrongful

the work, and that readiness is, for all purposes, equivalent to performance" 56 C.J.S. § 50, p. 444 n. 13 (citation omitted) ], as applied to a case like this and where used as a basis of recovery, is illogical and unsound.... [I]f the discharged employee can find employment it is his duty to accept it. How can it then be said that while [the employee] is performing service for another person he is constructively engaged in the employ of the employer by whom he was discharged? The result of this doctrine would be that the employee was actually performing service for one person while he was constructively performing service for another. *Id.* 250 Ill. at 134, 95 N.E. at 75–76 (The court did not acknowledge that suits for installments would have avoided this problem.) Thus, plaintiff received but one week's wages as a result of the court's about-face.

5. The First District reversed an award of "future damages" based on a breach of contract in which plaintiff would have been tenured and thus employed until retirement age. *Lewis v. Loyola University of Chicago*, 149 Ill.App.3d 88, 102 Ill.Dec. 425, 500 N.E.2d 47 (1st Dist.1986). The court cited *Mount Hope* for the proposition that "damages beyond [the date of trial] are disallowed due to their speculative and uncertain nature." *Id.* at 94, 102 Ill.Dec. at 429, 500 N.E.2d at 51. The same holding is found in *Corby v. Seventy–One Hundred Jeffery Ave. Bldg. Corp.*, 325 Ill.App. 442, 60 N.E.2d 236 (1st Dist.

1945). *Corby*, however, relied on *Mt. Hope* to leave the door open to periodic proceedings to recover wages as they come due or waiting until the expiration of the contract to seek recovery. *Id.* 325 Ill.App. at 457, 60 N.E.2d at 242.

6. The movement of the common law towards awarding damages beyond the date of trial appears to have begun, although not yet in Illinois. Modern evidentiary tools such as actuarial tables and labor statistics suggest that assessing damages beyond the date of trial is not unduly uncertain. William L. Mauk, in *Future Damages: The Right Remedy For Wrongful Discharge*, Trial Magazine Sept. 1990 at 23, challenges the assumption that traditional contract damages should not be awarded to an aggrieved employee because damages are "uncertain and speculative". He referred to the rule of law described as follows:

At one time there was a body of law that restricted the contract recoveries of wrongfully discharged employees to only those damages suffered as of the trial date. This approach was rejected long ago, however, as "wholly indefensible, logically and from a practical standpoint." It is well established that "the employee should get redress for all present and prospective injury.

*Id.* at 24 (quoting 11 *Williston on Contracts* § 1361 (3d ed. 1968) ). He referred to *Pierce v. Tennessee Coal, Iron & Railroad Co.*, 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591 (1899), a decision specifically rejecting the view that future damages are not recoverable.

discharge on the basis that the ordinance was unconstitutionally vague. The trial court ordered reinstatement and back pay. Defendant argued that plaintiff was not entitled to back pay because she was an at will employee who could have been discharged at any time. The court noted that there was no indication in the record that she would have left her job or been discharged had the parade incident not occurred. *Id.* at 294–95, 40 Ill.Dec. at 502–03, 406 N.E.2d at 608–09. It ruled that where she had been expressly discharged based on the unconstitutional ordinance, plaintiff was entitled to compensation for loss of earnings resulting from the improper discharge. *Id.* at 295, 40 Ill.Dec. at 503, 406 N.E.2d at 609. Upon her return to work, however, she would become, as before, an at will employee. *Id.*

A leading case from another jurisdiction is *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983).[7] There the employer fired the plaintiff without following the progressive disciplinary procedures of its employee handbook. The employer argued that damages should not include lost wages to the date of trial presumably on a theory similar to that advanced by EFS here: that had the employer followed its own rules, plaintiff could have been discharged at any time the employer chose. The court ruled, however, that where defendant had not shown that had plaintiff been warned he would not have been able to "mend his ways" and retain his employment to date of trial, the award of damages to that date was appropriate. *Id.* at 632.

On the other hand, in cases where the question was whether proper notice of termination had been given (rather than whether the termination itself was proper) the courts have awarded damages only for the additional time under the proper notice period. *See, Kemnetz v. Elliott Farmers Grain Co.*, 136 Ill.App.3d 226, 227, 90 Ill.

Dec. 793, 795, 482 N.E.2d 1076, 1078 (4th Dist.1985) (measure of damages was compensation the employee would have received during the additional time necessary for the notice to have been of proper length where "notice of a proper length would not have given the employee an opportunity to negate the employer's right to terminate the employment."); *Arneson v. Board of Trustees*, 210 Ill.App.3d 844, 155 Ill.Dec. 252, 569 N.E.2d 252 (5th Dist.1991) (failure to give proper notice of cancellation of contract entitled plaintiff to compensation and benefits he would have received during additional time necessary for the notice to have been of proper length).

An inference that can be drawn from these cases is that the employment contracts of these cases are not, in fact, at will. Rather, the employers have contracted away their right to terminate at will by interposing a guarantee of progressive discipline or advance notice of termination. Implicitly, employers by not agreeing to terminate without following procedures are agreeing that the employment contract is not terminable at will but intended to remain in place absent failure to conform to company policy after disciplinary procedures have been followed. *See Mitchell v. Jewel Food Stores*, 142 Ill.2d at 160, 154 Ill.Dec. at 614, 568 N.E.2d at 835 (quoting *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 619, 292 N.W.2d 880, 895 (1980)) ("Having announced the policy [to dismiss for cause only], presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory."); *Pine River*, 333 N.W.2d at 629 (Parties are not precluded from agreeing that the employment will not be terminable by the employer except pursuant to their agreement.). If this proposition is accepted, it follows that the damages rule of the

**7.** According to *Shepard's Citations, Pine River* has been cited by courts of appeals in approximately 35 states as well as numerous federal jurisdictions. The Illinois Supreme Court relied on the case in *Mitchell v. Jewel Food Stores*, 142 Ill.2d 152, 154 Ill.Dec. 606, 568 N.E.2d 827 (1990) and *Duldulao v. St. Mary of Nazareth*

*Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). The Illinois Appellate Court has also relied on *Pine River*. E.g., *Harrell v. Montgomery Ward & Co.*, 189 Ill.App.3d 516, 521, 136 Ill.Dec. 849, 853, 545 N.E.2d 373, 377 (1st Dist.1989).

*Mt. Hope* line of cases is more readily applicable than the rule of *Kendall.*

But another conclusion that can fairly be drawn from *Redemske, Pine State Bank, Kemnetz* and *Arneson* is that the trial courts do consider the evidence of what would have happened in the future. Thus it is reasonably certain that the courts of Illinois would reject plaintiff's view that evidence of what would have happened is inadmissible to rebut plaintiff's showing of damages and would consider whether the employment would likely have terminated at a point prior to trial. Just as plaintiff may attempt to show that had the breach not occurred he would still be employed at EFS, defendant must be able to rebut that showing lest plaintiff's proof become irrebuttable. Although the proof is necessarily uncertain, as stated in *Barnett,* certainty is not required; the evidence must only establish a basis for assessment of damages with a fair degree of probability.

Nevertheless, it can also be inferred from the cases that the courts do not automatically acquiesce in the employer's assertion that the employee would have been fired in any event. Indeed, the contrary is apparent, that the courts are skeptical of such arguments. Certainly, the burden of proof is on the employer. It was specifically placed on defendant in *Pine River.*[8] It was implicitly placed there in *Redemske.* Procedures such as those provided in EFS's handbook are designed to establish fairness to the employee and thus to benefit the employer with an improved work force. As stated in *Pine River,* "Implicit in this award of lost wages to the date of trial is our recognition that the bank's disciplinary procedures confer some degree of substantive protection to the employee. Without that, the disciplinary procedures here would be virtually meaningless." *Pine River,* 333 N.W.2d at 632.

■ In light of these conclusions, the evidence must be evaluated to determine whether EFS has established that Munoz

would have been fired on January 20, 1989 as EFS contends. The fact situation in the case before the court falls somewhere in the middle of the range of situations in the cited cases. The evidence is not entirely persuasive that plaintiff's employment would have continued as the courts indicated in *Redemske* and *Lewis;* on the other hand, it is not a case where the right to terminate was apparently clear, as in *Kemnetz* and *Arneson.* It is somewhat similar to *Pine River.* The circumstances here reveal changes in upper management that caused uncertainty and dissatisfaction at lower levels of management. Mr. Van Der Wielen, whom Munoz was unable to satisfy, has since left EFS. Mr. Koenig, whom EFS desired to retain, left as well. Mr. Packee is no longer a regional vice president but rather has resumed his former position as sales representative. The company entirely relocated this facility within a year of Munoz' departure. Thus it is safe to infer that there was turmoil at EFS and that the turmoil was not caused entirely by Munoz. No employee, even a highly satisfactory one, is without blemishes that can be conveniently paraded in defense of a claim of wrongful termination. But clearly, Munoz cared about his job and had a good record prior to the events giving rise to the lawsuit.

On the other hand, the courts are not in a position to second guess management decisions concerning employees, barring violations of public policy or law. *See Mitchell,* 142 Ill.2d at 160, 154 Ill.Dec. at 614, 568 N.E.2d at 835 (employer's prerogative to make independent good faith judgments about employees is important to our free enterprise system). Here there is evidence that EFS was dissatisfied with Munoz as early as April, 1988 when EFS offered Munoz' job to his subordinate. Although Munoz received an annual raise and bonuses after that date, during the fall of 1988 his relationship with upper management deteriorated. Munoz's credibility is doubtful when he asserts that he had no indication

---

8. Defendant's citation to *dicta* in *Cassel v. Ancilla Development Group, Ltd.,* 704 F.Supp. 865, 867 (N.D.Ill.1989), is not contrary to *Pine River.* Plaintiff, of course, has the burden to prove his damages, but he does not have to disprove defendant's contention that he would have been fired in any event.

that his job was in jeopardy. Specifically, this court finds him not credible when he denies the December telephone conversation with Van Der Weilen in which he was told to go home, the testimony of Packee that Munoz was disturbed enough about the situation to threaten to quit, and the testimony of Van Der Wielen at his termination indicating that he had seen it coming. The court finds no basis to infer that Van Der Wielen made the whole thing up, and in light of the testimony of all the witnesses concludes that the situation was not on an even keel at the time, suggesting that Munoz must have been aware that his position was not secure. Indeed, according to Van Der Wielen, Munoz spoke to him about this very topic. Munoz clearly had the tendency at trial to shape the facts to what he thought would serve his own interest rather than what actually occurred, as he even admits at note 11 of his brief.[9]

Although it is impossible to know how long plaintiff would have been employed had EFS followed its handbook, it can be inferred with considerable confidence that if EFS had followed the handbook Munoz would not have been fired on January 20 but rather that date would have been the initiation of the disciplinary proceedings provided therein. Even if one assumes that verbal and written warnings had been given by that date, at least a notice of suspension and counseling remained before EFS could have discharged Munoz. And one must also assume that EFS would have acted in good faith in administering its disciplinary procedures. *See id.* (employer may not treat promise as illusory); *Osten v. Shah,* 104 Ill.App.3d 784, 786, 60 Ill.Dec. 497, 499, 433 N.E.2d 294, 296 (3d Dist.1982) ("[I]n every contract both parties impliedly promise to act in good faith."); *Foster Enterprises v. Germania Federal Sav. & Loan Ass'n,* 97 Ill.App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (3d Dist. 1981) ("Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbi-

trarily or capriciously."). It is certainly conceivable that with direction and counseling, and a clear understanding that his job was on the line, Munoz would have been able to respond to the satisfaction of his superiors. Or, since other employees were shifted from one position to another, a demotion or transfer to a position Munoz could have handled more effectively might have grown out of the effort. Although these are "might-have-beens", this court believes that the courts of Illinois would impose the burden of the doubt on the breaching party rather than the non-breaching party and finds that if EFS had not breached the employment contract, Munoz would not have been terminated on January 20, 1989 and may well have continued in his employment to the date of trial.

This leaves the question whether and to what extent the amount Munoz would have earned between January 20, 1989 and the date of trial should be reduced by the amount he could reasonably have earned had he accepted a job at Preston Trucking Company. The first issue is one of fact, whether a job existed. The preponderance of the evidence is that a job was available for Munoz had he wanted it. It is more likely than not that if an offer was not made, it was not made because Munoz indicated informally that he did not want the job.

■ The next question is whether his failure to accept the job was an unreasonable failure to mitigate the damages resulting from EFS's breach. The doctrine of mitigation of damages requires the non-breaching party to exercise reasonable diligence to avoid his losses. The employer may reduce the amount of recoverable damages by whatever sum the plaintiff earned, or by the exercise of reasonable diligence could have earned, during the period in question. *Kelly v. Chicago Park District,* 409 Ill. 91, 98, 98 N.E.2d 738, 742 (1951); *Mt. Hope,* 139 Ill. at 79, 28 N.E. at 836 (*supra* note 4); *Ashe v. Sunshine Broadcasting Corp.,* 90 Ill.App.3d 97, 100,

---

9. In explaining the inconsistency between his deposition testimony that the Preston Trucking job was offered and his trial testimony that it was never actually offered, plaintiff stated that when he "stated that at his deposition he thought that was what counsel 'had wanted'."

45 Ill.Dec. 560, 562, 412 N.E.2d 1142, 1145 (5th Dist.1980). Defendant bears the burden of establishing that plaintiff failed to mitigate his damages. *Id.* at 100–01, 45 Ill.Dec. at 562, 412 N.E.2d at 1145; *People ex rel. Bourne v. Johnson,* 48 Ill.App.2d 307, 312–13, 199 N.E.2d 68, 71 (1st Dist. 1964), *aff'd,* 32 Ill.2d 324, 205 N.E.2d 470 (1965). As stated in *Williams v. Chicago Coal Co.,* 60 Ill. 149, 155 (1871), the discharged employee "... must not lie idle when it is practicable to get work of the same general character." In *Hill v. Bell Discount Corp.,* 39 Ill.App.2d 426, 188 N.E.2d 517 (1st Dist.1963), the court affirmed a ruling that the plaintiff, a semiskilled laborer, had failed to use reasonable diligence when he did not seek work as an unskilled laborer or work that paid less than what he had been earning. In *Wells v. Board of Education,* 121 Ill.App.2d 112, 257 N.E.2d 252 (1st Dist.1970), the court reduced plaintiff's damage award by the amount of earnings she received from employment 90 miles away from her home, rejecting plaintiff's argument that to do so was unreasonable. The common law seems to impose a greater obligation to mitigate losses in breach of contract situations than in employment discrimination situations where the courts have ruled that an aggrieved person is not required to accept employment of substantially lower remuneration or status. *See, e.g., Ford Motor Co. v. Equal Employment Opportunity Commission,* 458 U.S. 219, 231 n. 14, 102 S.Ct. 3057, 3065 n. 14, 73 L.Ed.2d 721 (1982) (Title VII claimants are not required to "go into another line of work, accept a demotion, or take a demeaning position.").

The court's judgment of the facts in this case is that Munoz did not exercise reasonable diligence in foregoing the opportunity to work at Preston. The work was in the same industry and, although it was of a lower level of responsibility, the opportunity for promotion was in the picture. Munoz cannot rest on his unwillingness to move as an excuse for declining the opportunity when he holds himself out as willing to move to Wisconsin in order to accept reinstatement at EFS. For these reasons, the court concludes that plaintiff's damages must be reduced by the amount he would have earned had he accepted the opportunity at Preston and continued there through the date of trial. The calculation proffered by plaintiff (footnote 8 of his post-trial brief) appears to be an accurate calculation and results in an award of damages in the amount of $37,171.48.[10]

### Reinstatement

■ Although most of the cases concerning unjust dismissal restrict relief to damages as discussed above, there is some authority in Illinois for reinstatement and

**10.**

| | |
|---|---|
| 1989 base salary, bonus and benefits if at Expedited | $54,998.04 |
| Less $10,052.46 other 1989 earnings (The $2,500 which Munoz earned from Deluxe Painting in 1989 must be factored out of 1989 earnings since Munoz could not have painted if he were working for Preston) | −$10,052.46 |
| Less $20,307.69 Preston earnings (Approximately $33,000 Preston salary, prorated from 5/21/89 through 12/31/89— $634.61 weekly × 32 weeks) | −$20,307.69 |
| Less $977.48 insurance benefits (since the job at Preston offered insurance, 7 months insurance coverage must be subtracted from 1989 damages) | −$ 977.48 |
| Alternative 1989 damages | −$23,650.41 |
| Since Munoz has earned more in 1990 than Preston would have paid, the alternative 1990 damage calculation remains the same except that $1,326.58 for lost insurance is subtracted. 1990 alternative damages through 10/12/90 | $13,521.07 |
| Total alternative damages through 10/12/90 | $37,171.48 |

EFS argues that the $200 valuation for the company car was not substantiated. Munoz testified that a Chevy Astro was given to him which he used to drive back and forth to work. EFS bore the cost of the vehicle and the insurance. Munoz bought the gas. EFS offered *no* evidence to show that the value of the use of the vehicle was less than $200 a month. Thus, plaintiff's estimate is unrebutted. It is a reasonable estimate in the court's view.

**1192**

injunctive relief where the discharge is "wrongful" (against public policy). In addition to the reinstatement ordered in *Redemske*, in *Hartlein v. Illinois Power Co.*, 209 Ill.App.3d 948, 154 Ill.Dec. 520, 568 N.E.2d 520 (5th Dist.1991), the court affirmed the entry of a preliminary injunction to restrain the employer from discontinuing plaintiff's employment in order to avoid worker's compensation liability. Nevertheless, plaintiff has not cited a single Illinois case even suggesting that reinstatement may be an appropriate remedy for breach of employment contract. Thus, his claim for reinstatement must be denied.

### ORDER

Enter Findings of Fact and Conclusions of Fact and Law After Trial. The clerk is directed to enter judgment in favor of plaintiff Ricardo Munoz and against defendant, Expedited Freight Systems, Inc., in the amount of $37,171.48.