**RIV VIL, INC., Plaintiff,**

v.

**Kenneth L. TUCKER and Richard H. Tucker, Defendants.**

**No. 95 C 4408.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 23, 1997.

---

Richard Michael Hoffman, Richard Lee Fenton, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Plaintiff.

Craig M. White, Lawrence W. Falbe, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

General Electric Capital Corporation ("GECC")[1] brought a breach of contract action against the defendants, Kenneth L. Tucker and Richard H. Tucker. The defendants asserted several defenses and moved for summary judgment with respect to two of them. The plaintiff moved for summary judgment with respect to all defenses. For the following reasons, the defendants' motion is denied and the plaintiff's motion is granted.

### I. Background[2]

The Tuckers are in the business of acquiring, developing, leasing, and managing shopping centers. They conduct their business transactions through a variety of entities, including The Tucker Companies, Tucker Evansville Limited Partnership ("Tucker Evansville"), and Tucker Master General Partnership ("Tucker Master"). The Tuckers and GECC have a long-standing relationship.

Beginning in the late 1980's, GECC provided financing for several Tucker ventures, including approximately $70 million for a redevelopment project in Chicago and over $20 million for a shopping center acquisition in Naperville.

In February 1992, upon the default by the original borrower, GECC offered the Tuckers the ownership and management of two properties located in Evansville, Indiana—Washington Square Mall Shopping Center ("WS Mall") and Lawndale Shopping Center ("Lawndale"). Tucker Evansville, formed for this purpose, of which the Tuckers were limited partners, acquired the properties and assumed the attendant note and mortgage obligations ("Evansville Loan") on or about February 28, 1992.

In late 1992, the Tuckers began exploring the possibility of taking The Tucker Companies public through a real estate investment trust ("REIT"). GECC's cooperation was necessary to secure the release of mortgages and participation interests,[3] which GECC held on a number of properties to be included in the REIT. Additionally, the Tuckers required financing to acquire more properties for the REIT and to fund the REIT itself. Negotiations between the Tuckers and GECC began in January 1993. Tucker Master was created as a vehicle for effectuating the REIT.

The Master Loan Agreement was executed on June 25, 1993. Among other things, the Agreement severed the Lawndale loan from the Evansville Loan, because the WS Mall would not be included in the REIT, while the Lawndale property would be. The mortgages on the properties to be included in the REIT were to be repaid and therefore released, while the mortgage on the WS Mall was to remain. Tucker Master assumed the modified Evansville Loan from Tucker Evansville.

1. The suit was originally brought by GECC. RIV VIL, Inc. ("RIV VIL") is GECC's assignee. On August 5, 1996, I entered an order substituting RIV VIL as plaintiff. Since most relevant documents and testimony refer to GECC, to avoid confusion, I will use the term "GECC" to refer to the original plaintiff and its successor, RIV VIL.

2. The following facts are undisputed and are gleaned from the 12(M) Statements filed by both parties in their cross-summary judgment motions.

3. A participation interest entitled GECC to a percentage of proceeds in the event of sale or refinancing of a property.

Section 5.15 of the Master Loan Agreement, the so-called Master Lease provision, which is the subject of this lawsuit, provided, in relevant part, as follows:

> In the event that the WS Mall Loan shall not have been paid in full on or prior to December 31, 1994, then:
>
> (a) KLT[, Kenneth Tucker,] and RHT[, Richard Tucker,] hereby covenant and agree to jointly and severally execute and deliver (or to jointly and severally guarantee) a master lease of the WS Mall (herein called the "WS Mall Master Lease") which will provide during the term of the WS Mall Master Lease a minimum Net Operating Income from the WS Mall of not less than $2,500,000 per annum; [4]

> . . . .

> (f) In the event that KLT and RHT shall fail to execute and deliver the WS Mall Master Lease, they shall be and become jointly and severally personally obligated and liable for all rents which would become due under such a WS Mall Master Lease as provided in Subsection (a) above less amounts received by GECC from occupancy tenants, notwithstanding any other exculpation herein or in any of the Borrower's Loan Documents.

GECC agreed to provide $50 million to enable the Tuckers to acquire additional properties for the REIT, to establish a $45 million credit line facility for the REIT, and to release mortgages and its participating interests on the properties comprising the REIT. The REIT transaction closed on or about October 3, 1993. GECC provided the financing set forth above and released the mortgages and the participating interests. GECC received the balance of the outstanding debts on the properties included in the REIT and $7.7 million of the offering proceeds.[5]

Various tenant possibilities were explored by the Tuckers and GECC for the purposes of fulfilling the Master Lease provision. However, no WS Mall Master Lease was ever executed. On February 8, 1995, GECC notified Tucker Evansville [6] that it was declaring a "default" as of December 1994 on the WS Mall loan. The loan is as yet unpaid.

On July 31, 1995, GECC filed suit to enforce § 5.15(f) of the Master Loan Agreement, seeking declaratory judgment and damages. The Tuckers seek summary judgment with respect to their defenses of vagueness and release. GECC moved for summary judgment with respect to all defenses.

## II.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All reasonable inferences must be drawn in favor of the non-moving party. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). However, a "scintilla of evidence" will not suffice. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991).

### A. Vagueness/Ambiguity

[1–4] Both parties move for summary judgment on the basis of their construction of § 5.15(f) of the Master Loan Agreement. "Under Illinois law, the primary objective in construing a contract is to give effect to the parties' intent." [7] *Home Ins. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d 763,

---

4. On October 3, 1993, the Tuckers' Master Lease obligation was increased form $2,500,000 to $2,560,000 per year. However, since the original Master Loan Agreement and the relevant testimony refer to $2.5 million, to avoid confusion, I will do the same.

5. The parties refer to this amount as the "kicker," designed primarily to compensate GECC for the release of its participating interests.

6. On April 22, 1994, Tucker Evansville reassumed liability under the Evansville Loan (WS Mall loan) from Tucker Master.

7. The Master Loan Agreement is governed by Illinois law.

767 (7th Cir.1995). It is for the court to determine whether the contract terms are ambiguous. *Meyer v. Marilyn Miglin, Inc.,* 273 Ill.App.3d 882, 652 N.E.2d 1233, 1237–38, 210 Ill.Dec. 257, 261–62 (1995). If the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract. If the contract is ambiguous, the court may consider extrinsic evidence. *Id.* When a "party files a motion for summary judgment requiring interpretation of a contract, the district court must determine (1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any triable issues of fact." *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993). If, with the use of extrinsic evidence, the material terms cannot be rendered definite and certain, the contract is unenforceable. *See Meyer,* 652 N.E.2d at 1238, 210 Ill.Dec. at 262.

■ The controversial phrase is the measure of the Tuckers' personal liability: "all rents which would become due under such a WS Mall Master Lease as provided in Subsection (a) above less amounts received by GECC from occupancy tenants." A contract is ambiguous "when the language used ... is obscure in meaning through indefiniteness of expression." *Wald v. Chicago Shippers Ass'n,* 175 Ill.App.3d 607, 529 N.E.2d 1138, 1145, 125 Ill.Dec. 62, 69 (1988) (citation omitted). The terms "rents" and "amounts received by GECC from occupancy tenants" are not formally defined in the Master Loan Agreement. Cross-referencing § 5.15(a) does not entirely clarify the meaning of "rents," because § 5.15(a) does not mention rents, but speaks in terms of a Net Operating Income (NOI), of which rents are only a part. (*See* Master Loan Agreement § 1.1, at 8.) Therefore, I conclude that the phrase "all rents which would become due under such a WS Mall Master Lease as provided in Subsection (a) above less amounts received by GECC from occupancy tenants" is ambiguous. *See Senkan v. Illinois Inst. of Technology,* No. 92 C 3238, 1993 WL 98225, at *3–*4 (N.D.Ill. Mar.31, 1993), *aff'd,* 21 F.3d 430 (7th Cir.1994) (lack of definition of terms renders contract ambiguous); *see also United Thermal Indus., Inc. v. Asbestos Training &*

*Employment, Inc.,* 920 F.2d 1345, 1349 (7th Cir.1990) (terms are ambiguous if the parties' obligation under contract is unclear).

■ If the contract is ambiguous, "the parties' intentions can be determined from their declarations and conduct and from surrounding circumstances." *Chandler v. Maxwell Manor Nursing Home, Inc.,* 281 Ill. App.3d 309, 666 N.E.2d 740, 749, 217 Ill.Dec. 71 (1996). Richard Tucker testified as follows regarding what the parties contemplated to be the extent of the Tuckers' personal liability:

Q: [W]hat are [the] terms [of the Master Lease] as you understand them?

A: *There was a Master Lease to be signed that called for an NOI of $2.5 million.*

Q: Okay. In other words, that the Master Lease or rental from the Master Lease would essentially cover NOI to the level of 2.5 million, correct?

A: Correct.

Q: So that if there was sufficient cash flow being thrown off from other tenants to cover the $2.5 million, your rental payments under the Master Lease would be essentially zero, correct?

A: Correct.

Q: *And if there was a shortfall in the rental from other tenants, your obligation under the Master Lease would essentially cover the shortfall up to $2.5 million?*

A: Correct.

(R. Tucker Dep., Vol. I at 107) (emphasis added).

GECC's David Henry testified that at the time the Master Loan Agreement was being drafted, GECC was concerned about the income-generating capacity of the WS Mall and about the Tuckers' desire to exclude the property from the REIT. The purpose of the Master Lease provision was to ensure that "[t]he Tuckers were going to stand behind the lease obligations of the shopping center, both existing and projected." (Henry Dep. at 14, 21.)

■ Construing these testimonies with § 5.15(a), the following picture emerges:

§ 5.15(a) obligated the Tuckers to "execute and deliver (or to jointly and severally guarantee) a master lease of the WS Mall ... which will provide during the term of the WS Mall Master Lease *a minimum Net Operating Income [ (NOI) ] from the WS Mall of not less than $2,500,000 per annum.*" (emphasis added). The reference to § 5.15(a) in § 5.15(f) sheds light on the meaning of "rents." *CSX Transportation v. Chicago & North Western Transportation Co.*, 62 F.3d 185, 190 (7th Cir.1995) (under Illinois rules of construction, a contract must be interpreted as a whole, giving meaning and effect to each provision). NOI is defined in § 1.1 of the Master Loan Agreement as the difference between operating revenues and operating expenses. Operating revenues include rents. Thus, the "rents" contemplated in § 5.15(f) are the rents which are capable of generating an annual NOI of $2.5 million. In the event the defendants failed to execute a lease required by § 5.15(a), § 5.15(f) triggered their personal liability for any difference between $2.5 million and what the existing WS Mall leases actually generated in terms of NOI.

The Tuckers disagree with this interpretation because if the Master Lease generated in excess of $2.5 million, the difference between $2.5 million and the lease NOI would yield a negative number and "rent money would be owed to the tenants." (Tuckers' Mem. in Supp. of Mot. for Summ. J. at 7.) This is a red herring. § 5.15(f) does not come into play if a Master Lease exists. Moreover, Richard Tucker's understanding was that "if there was sufficient cash flow being thrown off ... to cover the $2.5 million, [the Tuckers'] rental payments under the Master Lease would be essentially zero." (R. Tucker Dep., Vol. I at 107.)

The Tuckers also insist that "when § 5.15(f) was created, the parties must have counted on a GECC-approved Master Lease document to be executed in the future[, because w]ithout such a lease that articulates an annual rent, § 5.15(f) cannot yield the dollar amount of the Tuckers' purported liability." (Tuckers' Mem. in Supp. of Mot. for

Summ. J. at 8.) This argument is nonsensical because the existence of a Master Lease, as provided in § 5.15(a), and the Tuckers' personal liability in § 5.15(f) are mutually exclusive.

Section 5.15(f) provides that the Tuckers' liability is to be reduced by the "amounts received by GECC from occupancy tenants." Imputing the ordinary and plain meanings to words, *Darwish v. Nationwide Mut. Ins. Co.*, 246 Ill.App.3d 903, 617 N.E.2d 72, 74, 186 Ill.Dec. 833, 835 (1993), and construing the words in the context in which they are used, *Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1403 (7th Cir.1994), this phrase means what it says—whatever funds GECC receives directly from the WS Mall tenants would be deducted from the Tuckers' obligation under § 5.15(f), the difference between $2.5 million and what the existing WS Mall leases actually generated in terms of NOI.

At the time § 5.15 was being drafted, The Tucker Companies was Tucker Evansville's managing agent with respect to the WS Mall. (*See* Management/Leasing Agreement of 2/25/92.) One of The Tucker Companies' obligations was to collect rents and other charges from the tenants. Upon the signing of the Master Loan Agreement, Tucker Master stepped into Tucker Evansville's shoes with respect to the WS Mall. One of GECC's remedies upon Tucker Master's default under the WS Mall loan was the right to collect rents and charges directly. Thus, the phrase "amounts received by GECC from occupancy tenants" refers to the rents and other charges paid by the WS Mall tenants directly to GECC, rather than The Tucker Companies. The Tuckers would logically want assurances that such collections would be applied to the calculation of their liability.

The Tuckers offer a different formula, whereby "amounts received by GECC from occupancy tenants" are the difference between the NOI and the operating expenses.[8] This is not a reasonable construction because GECC did not receive the NOI or the operating expenses from the tenants. Rather,

---

**8.** This formula is based upon the definition of the NOI, which is the difference between receipts and revenues from tenants in occupancy and operating expenses. (Master Loan Agreement § 1.1, at 8 .)

GECC received the NOI from Tucker Master, after Tucker Master, through The Tucker Companies, had collected the rents and charges and deducted from them the operating expenses.[9]

■ The Tuckers' argument in support of their summary judgment motion is that § 5.15(f) is unenforceably vague. Thus, for GECC to withstand the Tuckers' motion, the plaintiff has to create a factual issue that the meaning of the phrase "all rents which would become due under such a WS Mall Master Lease as provided in Subsection (a) above less amounts received by GECC from occupancy tenants" is sufficiently definite and certain for § 5.15(f) to be enforceable. A contract is sufficiently definite and certain to be enforceable so long as the court is "enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 515 N.E.2d 61, 65, 113 Ill.Dec. 252, 257 (1987) (quotation omitted). In light of the foregoing, GECC has satisfied its burden.

The Tuckers have not raised a genuine issue of material fact that the parties' intent in § 5.15(f) was something other than what the plaintiff has argued. Accordingly, unless the Tuckers are entitled to relief or trial on one of their affirmative defenses, plaintiff is entitled to summary judgment.[10]

### B. Release

■ Both parties seek summary judgment on the Tuckers' affirmative defense of release. Each relies on its construction of ¶ 10

of the Loan Assumption Agreement entered into on April 22, 1994 ("Loan Assumption Agreement").

Approximately ten months after the execution of the Master Loan Agreement, GECC, Tucker Master, and Tucker Evansville entered into a Loan Assumption Agreement, whereby Tucker Evansville reassumed the obligations of the WS Mall loan under the Evansville Loan. The Tuckers also personally guaranteed the loan. Paragraph 10 in the Loan Assumption Agreement provides, in relevant part, that

> [e]xcept with respect to any liability undertaken pursuant to the Guarantee, neither Borrower nor any of the general or limited partners of Borrower (collectively called the "Obligation Parties") shall, under any circumstances be personally liable for the repayment of any of the principal of, interest (including Base Interest, Deferred Base Interest, Cash Flow Interest and Participation Interest) on, or prepayment fees or late charges, or other charges or fees, including, without limitation, attorneys' fees, due in connection with, the Evansville Loan or for the performance of any other obligation as contained in the Evansville Loan Documents or for and only to the extent of any deficiency judgement which Lender may obtain after foreclosure of the Evansville Mortgage after default by Borrower; *provided, however,* that the Borrower shall be personally liable for and only to the extent of, . . . .

It is undisputed that the Tuckers were limited partners of Tucker Evansville and that the Master Loan Agreement is part of

---

**9.** The Tuckers also argue that § 5.15 is unenforceably vague because it does not specify the bounds of the property, the term of the Master Lease, the amount of rent, and the time and manner of payment. (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 13–17.) Presumably, what they mean is that their duty under § 5.15(a), which obligated them to enter into the Master Lease and whose breach created personal liability pursuant to § 5.15(f), is unclear. The parties' course of conduct contradicts this argument and reveals that the Tuckers knew precisely what was expected of them under § 5.15(a). The record shows that various tenant possibilities were explored by the Tuckers and GECC for the purposes of fulfilling § 5.15(a). Moreover, in June 1994, GECC approved a Master Lease involving

Media Plan, although Media Plan chose not to go forward with the transaction.

**10.** In their Reply in support of their motion for summary judgment, the Tuckers argue that § 5.15(f) is unenforceable because GECC has elected to seek remedies under § 5.15(e) and because § 5.15(f) is a liquidated damages clause for § 5.15(a). I will not address these arguments because the defendants did not raise them in the memorandum accompanying their summary judgment motion. *See, e.g., United States v. Hughes*, 970 F.2d 227, 234 (7th Cir.1992) (arguments raised for the first time in a reply brief are waived).

the Evansville Loan Documents. Pointing to the language "neither Borrower[, Tucker Evansville,] nor any of the general or limited partners of Borrower[, the Tuckers,] ... shall, under any circumstances be personally liable ... for the performance of any ... obligation as contained in the Evansville Loan Documents," the Tuckers contend that the above provision released them from the Master Lease obligation under § 5.15. GECC counters that ¶ 10 is unrelated to § 5.15, but merely emphasizes that the loan at issue in the Loan Assumption Agreement is nonrecourse as to Tucker Evansville and its general and limited partners. The provision is ambiguous since the language can reasonably be interpreted in more than one way. *Wald,* 529 N.E.2d at 1145, 125 Ill.Dec. at 69.

▆▆▆▆ "A release is the abandonment of a claim to the person against whom the claim exists." *Simmons v. Blauw,* 263 Ill.App.3d 829, 635 N.E.2d 601, 603, 200 Ill.Dec. 262, 264 (1994). The Tuckers' labelling ¶ 10 a release does not make it so. Strikingly absent from ¶ 10 is the word "release" or any synonym.[11] A release is a contract and, as such, is governed by contract law. *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 581 N.E.2d 664, 667, 163 Ill.Dec. 510, 513 (1991). Since the provision under dispute is ambiguous, my task is to determine the intent of the parties by using extrinsic evidence, including the parties' declarations and conduct, and surrounding circumstances. *Chandler,* 666 N.E.2d at 749, 217 Ill.Dec. at 80; *see also Hernandez v. United Fire Ins. Co.,* 79 F.R.D. 419, 432 (N.D.Ill.1978) ("[i]n determining whether an agreement constitutes a release, ..., all of the circumstances are to be considered with a view toward enforcing the true intentions of the parties").

The Tuckers' personal obligation in § 5.15(f) exists "notwithstanding any other exculpation herein or in any of the Borrower's Loan Documents." The Tuckers argue that since § 5.15 was drafted prior to the Loan Assumption Document, the above phrase could not have contemplated prospective documents. I disagree because the definition of "Borrower's Loan Documents" includes "all ... instruments ... relating to the Borrower's Loans." (*See* Master Loan Agreement § 1.1, at 3.) "Borrower's Loans" included the WS Mall loan, which is the subject of the Loan Assumption Agreement. Therefore, the Loan Assumption Agreement is part of the Borrower's Loan Documents.

Although Richard Tucker testified that it was his understanding at the time he signed the Loan Assumption Agreement that ¶ 10 would release the Tuckers from the Master Lease obligation, he did not recall having any discussions with GECC regarding the meaning of this provision. (R. Tucker Dep., Vol. I at 173–74.)[12] The parties' course of dealing confirms that there was no intent to release the Master Lease obligation. On August 27, 1993, Tucker Master and GECC executed a Fourth Modification Agreement. The Tuckers signed as guarantors. Given the Tuckers' instant argument, since ¶ 15 of the Fourth Modification Agreement is identical to ¶ 10 of the Loan Assumption Agreement, the Tuckers would be expected to deem themselves released from the Master Lease obligation after August 27, 1993. However, on October 3, 1993, GECC, Tucker Master, and the Tuckers entered into a Letter Agreement in which the Tuckers agreed to increase their Master Lease obligation form $2,500,000 to $2,560,000 per year. The Tuckers' entry into this Letter Agreement shows

**11.** Thus, *Murphy v. S–M Delaware, Inc.,* 95 Ill. App.3d 562, 420 N.E.2d 456, 51 Ill.Dec. 42 (1981), is inapposite. In *Murphy,* a Selling Stockholders' Consent and Agreement provided, in part, that "[t]he Selling Stockholders hereby *release* Salerno–Megowen Biscuit Company ... and S–M Delaware, Inc. [, the defendants,] ... from all actions, causes of action, debts, obligations, liabilities, claims and demands whatsoever, in law or in equity, which the Selling Stockholders ... ever had, now have or hereafter can, shall or may have against the Companies...." *Id.* 420 N.E.2d at 458, 51 Ill.Dec. at 44 (emphasis added). The court held that the release encom-

passed commissions, earned by the plaintiff stockholder in the disposition of the defendants' stock. *Id.* at 459–60, 51 Ill.Dec. at 45–46.

**12.** It seems highly improbable that GECC would not have discussed this subject with the Tuckers. Indeed, if the plaintiff intended to release the Tuckers from the Master Lease obligation, they would surely have done so explicitly and the Tuckers would have insisted on unambiguous language to obviate the need for litigation such as this one.

that they did not deem ¶ 15 to be a release from the Master Lease obligation under the Master Loan Agreement. Thus, it is not plausible that the Tuckers regarded ¶ 10 as a release.[13]

The Tuckers' response is that the Fourth Modification Agreement is irrelevant because the Tuckers are not relying on its ¶ 15 to assert release. This misconstrues the concept of relevance. In the next breath, the Tuckers imply that the Fourth Modification did release them. The letter of October 3, 1993, they continue, reinstated the Master Lease obligation. The Loan Assumption Agreement, in turn, reinstated the release.[14] The defendants neither offer any evidence to substantiate such bizarre developments, nor explain the reasons for them. Finally, the Tuckers argue that ¶ 10 of the Loan Assumption Agreement was intended to release the Tuckers from personal liability because at the time the Agreement was signed, April 1994, GECC expected the Media Play lease to become the Master Lease, thereby fulfilling the requirements of § 5.15(a). This argument, however, is unpersuasive. The evidence to which the Tuckers point shows that the lease with Media Play was in the process of being negotiated and was far from being a certainty.[15] Accordingly, ¶ 10 of the Loan Assumption Agreement did not, as a matter of law, release the Tuckers from the Master Lease obligation under § 5.15 of the Master Loan Agreement. Therefore, with respect to

the release defense, the defendants' motion for summary judgment is denied, while the plaintiff's motion for summary judgment is granted.

### C. Economic Duress

To avoid a contract on the basis of economic duress, the defendant must show that he was (1) induced by a wrongful act or threat to enter into that contract, (2) under circumstances that deprived him of free will. *Kaplan v. Kaplan*, 25 Ill.2d 181, 186, 182 N.E.2d 706, 709 (1962); *in re Marriage of Hamm–Smith*, 261 Ill.App.3d 209, 633 N.E.2d 225, 230, 198 Ill.Dec. 763, 768 (1994) (person asserting duress has burden of proving by clear and convincing evidence that he was bereft of quality of mind essential to entering into contract). The Tuckers contend that "GECC wrongfully, at the last minute and under threat of terminating Tucker Master's REIT deal, coerced Ken and Rich Tucker, *as individuals*, to 'agree' to undertake some kind of personal liability related to a property on which neither Ken or Rich was ever an owner, borrower, landlord or tenant." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 19.)

First, in cases where agreements have been invalidated because of duress, "the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing." *Alexander v. Standard Oil Co.*, 97 Ill.App.3d 809, 423

---

13. The record shows that numerous GECC's lending documents include language identical to that in ¶ 10 of the Loan Assumption Agreement. One example is ¶ 21 of the Assumption and Forbearance Agreement, by which Tucker Evansville came to be the owner and manager of the Evansville properties in February 1992. Another example is ¶ 12 of the First Loan Modification Agreement signed in April 1992. Since the Master Lease obligation did not yet exist in 1992, ¶¶ 21 and 12 could not possibly have meant what the Tuckers say ¶ 10 of the Loan Assumption Agreement means. On the other hand, it is reasonable that they mean what GECC argues ¶ 10 means, i.e., that the loan governed by the document is non-recourse as to Tucker Evansville and its general and limited partners.

14. The Tuckers state that "the parties executed the *October, 1993 letter agreement to re-establish* a commitment to eventually negotiate a WS Mall master lease *after § 5.15 had been abandoned by the Fourth Modification Agreement.*" (Reply

Mem. in Supp. of Defs.' Mot. for Summ. J. at 14) (emphasis added). The Tuckers also state that the following "appears to be the correct sequence of the drafted and executed documents[:]" GECC's attorneys

wrote a Fourth Loan Modification in August 1993 which released the Tuckers from any obligation to execute a future Master Lease under ¶ 5.15(a) of the Master Loan Agreement (dated 6/25/93); ... *then* created an October 3, 1993 letter agreement which seemingly reaffirmed the released obligation to perform under ¶ 5.15(a); ... *and then* wrote a Loan Assumption Agreement in April, 1994 which finally released the reaffirmation of ¶ 5.15(a) of October 3, 1993.

Tuckers' Response to GECC's 12(M) Statement ¶ 69, at 40.

15. GECC did not approve the Media Play lease until June 1994. Media Play, however, chose not to go forward with the deal.

**656**

N.E.2d 578, 583, 53 Ill.Dec. 194, 199 (1981). It is not wrongful to threaten to do something that one has a legal right to do. *Id.* 423 N.E.2d at 582, 53 Ill.Dec. at 198. Moreover, "mere hard bargaining is not enough." *Resolution Trust Corp. v. Ruggiero,* 977 F.2d 309, 314 (7th Cir.1992). GECC had the legal right to bargain for the best possible terms in exchange for financing the REIT and releasing its mortgage and participation interests, including demanding that the Tuckers assume personal liability in connection with the WS Mall. *See id.* (forcing borrower to assume personal liability on note was not wrongful because lender had no reason, much less any obligation, to alter terms of note).[16]

Second, "the mere fact that [the borrower] [wa]s in a difficult bargaining position due to desperate financial circumstances" does not render him "bereft of the quality of mind essential to a contract," especially if "the pressures on the borrower [we]re the result of his own business decisions and economic condition," and the lender "had nothing to do with putting [the borrower] in a position where he needed the money." *Id.* (quotation omitted). In the instant case, it is undisputed that the Tuckers' investment of over $1 million in the REIT, prior to signing the Master Loan Agreement, was a voluntary decision, based on the defendants' desire to go public. As sophisticated investors with legal representation, the Tuckers surely knew that the deal could fall apart at any time for a host of reasons. It is further undisputed that, when the time came to sign the Master Loan Agreement, the Tuckers knew what they were getting into and made a rational calculation to go forward. Finally, it is undisputed that the Tuckers never sought to rescind the Master Loan Agreement on the basis of duress, *see id.* (borrower neither complained to lender that he was under duress during transaction at issue, nor raised economic duress defense until sued), and accepted numerous benefits under the

Agreement. *Hong v. Teachers Ins. & Annuity Association of America,* 718 F.2d 871, 874 (8th Cir.1983) (contract entered into under duress not void where party accepted contract benefits, thereby ratifying it).

The Tuckers' unsubstantiated insistence that "genuine issues of fact exist," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 19), does not create such issues. *Federal Deposit Ins. Corp. v. Linn,* 671 F.Supp. 547, 556 (N.D.Ill. 1987) ("Defendants cannot avoid [summary judgment] ... merely by arguing the existence of economic duress is a factual issue to be resolved by the jury."); *see also in re Marriage of Hamm–Smith,* 633 N.E.2d at 230, 198 Ill.Dec. at 768 (clear and convincing evidence standard for economic duress). Therefore, the GECC's summary judgment motion is granted with respect to the defense of economic duress.

### D. Commercial Frustration

 The doctrine of commercial frustration excuses performance when the parties' overall contractual intent and objectives have been completely thwarted. *Leonard v. Autocar Sales & Serv. Co.,* 392 Ill. 182, 64 N.E.2d 477, 479–80 (1945). Because it is an exception to the general rule that parties must abide by their contract in spite of contingencies, the court should be spare in finding commercial frustration. *Medco Research, Inc. v. Fujisawa USA, Inc.,* Nos. 93 C 2705, 93 C 2724, 1994 WL 719220, at *11 (N.D.Ill.Dec.21, 1994). The defendant invoking commercial frustration must show that the frustrating event was not reasonably foreseeable and that the value of counterperformance was totally or nearly totally destroyed by the frustrating event. *Farm Credit Bank v. Dorr,* 250 Ill.App.3d 1, 620 N.E.2d 549, 556, 189 Ill.Dec. 581, 588 (1993). The Tuckers claim that GECC frustrated their ability to achieve the minimum net operating income required under § 5.15(a) of the Master Loan Agreement by disapproving various lease opportunities that the Tuckers presented to them, and by removing them

---

**16.** The fact that § 5.15 pertained to the WS Mall which "never went to the REIT," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 20), is not probative for the purposes of raising an inference of economic duress. Furthermore, I reject the Tuckers' attempt to abstract § 5.15 and analyze it

separately from the Master Loan Agreement, by characterizing § 5.15 as "a fundamentally different deal because it deals *solely* with WS Mall, a proposal to lease, and the Tuckers individually." (*Id.*) The Agreement must be viewed as a whole.

from management of the WS Mall after default.

### 1. Lease Approval and Disapproval

 The Tuckers do not dispute that GECC had an unequivocal right to approve or disapprove WS Mall leases for more than 2,500 square feet. They argue, however, that because there is a factual issue as to "whether GECC exercised its discretion reasonably and in good faith with regard to the disapproval of leases both before and after the foreclosure," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 23–24), there is a factual issue as to whether lease disapproval was reasonably foreseeable. The Tuckers' evidence is GECC's conduct with respect to the Media Play lease proposal.[17] It is undisputed that GECC approved the Media Play lease in June 1994, subject to certain conditions.[18] The defendants argue that the conditions are "clear examples of GECC's bad faith in thwarting the Tuckers' legitimate attempts to reduce or avoid the potential personal liability under § 5.15." (Id. at 25.) However, by failing to provide context for the GECC's conditions, the Tuckers mischaracterize them. Far from "turn[ing] § 5.15 into a moving target which always moved just out of [the Tuckers'] reach," (id.), GECC was proposing terms for repayment of an additional loan of approximately $2.3 million, which the Tuckers needed and requested to implement the Media Play project. The Tuckers · have provided no authority that would suggest that the GECC had an obligation to lend additional funds to the Tuckers, or to lend under specific terms.

It is undisputed that Media Play made the decision not to pursue a lease at the WS Mall. The defendants argue that the plaintiff's "undue delay ... in considering the lease" resulted in Media Play's decision not to go forward. (Id. at 24.) The Tuckers point to the testimony of The Tucker Companies' Norris R. Eber. However, nothing in that testimony supports the defendants' contention. Rather, Mr. Eber conceded that timing problems are inherent in negotiating a retail lease such as Media Play's, and relayed that the Media Play's broker merely told him that Tucker Evansville "missed the timing." (Eber Dep. at 131, 150.) In short, the Tuckers have presented no evidence from which a rational factfinder could conclude that GECC did not exercise its discretion reasonably or in good faith with respect to lease approval.

### 2. Removal from Management

 The Tuckers assert that on February 8, 1995, GECC notified Tucker Evansville[19] that it was declaring a "default" as of December 1994 on the WS Mall loan. They further assert that, on May 31, 1995, GECC filed a foreclosure action, and in September 1995, appointed a receiver for the property, thereby removing the Tuckers from running the WS Mall. The Tuckers point out that GECC's asserted reason for the Master Lease provision was to "keep the Tuckers interested" in the WS Mall, and that the Tuckers' expertise was the reason GECC asked them to take over the management of the struggling property in 1992. Therefore, the defendants argue, § 5.15 plainly contemplated the Tuckers' participation in the management of the WS Mall even after default.

It is undisputed, however, that default gave GECC a host of remedies, including management of the property, foreclosure, and appointment of a receiver. Further, the loan documents neither expressly nor impliedly provide that the Tuckers must continue to manage the WS Mall after default. Finally, according to § 5.15, in order to avoid

---

17. The defendants do not address the Malibu Grill or the Bacon's leases.

18. The conditions, with added emphasis, were as follows:
 i) Income generated from the Media Play lease will impact the annual income requirement of the master lease obligation by Kenneth and Richard Tucker only to the extent that such income exceeds the interest cost on the *required loan increase* ....

ii) GECC will receive a preferred participation interest upon sale or refinance of the property[, WS Mall,] in an amount sufficient to provide an 18% return on the *additional loan fundings* for the period such funds are outstanding....

19. On April 22, 1994, Tucker Evansville reassumed liability under the Evansville Loan (WS Mall loan) from Tucker Master.

personal liability, the Tuckers had to pay off the WS Mall loan by December 31, 1994 or execute an appropriate Master Lease to commence no later than January 1, 1995. By the defendants' own admission, GECC left the Tuckers in the driver's seat, looking for tenants, and with full "ability to impact WS Mall's Net Operating Income," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 23), until September 1995 when the receiver was appointed. Accordingly, the Tuckers have not presented sufficient evidence from which a rational factfinder could conclude that the alleged frustrating event, the appointment of a receiver by the GECC, was not reasonably foreseeable. Having failed to create a factual issue with respect to the first element of the commercial frustration doctrine, the Tuckers cannot withstand GECC's summary judgment motion as to this defense.[20]

### E. Lack of Consideration

■■■■■ The Tuckers argue that they received no consideration in exchange for a promise to enter into a Master Lease for the WS Mall. Under Illinois law, "[a]ny act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 371 N.E.2d 634, 639, 13 Ill.Dec. 699, 704 (1977). Tucker Master expected and received numerous undisputed benefits from the Master Loan Agreement, including $50 million to enable the Tuckers to acquire two specific properties for the REIT and a $45 million credit line facility.[21] Since a benefit to a third party constitutes valid consideration, *State Bank v. Sorenson*, 167 Ill.App.3d 674,

521 N.E.2d 587, 594, 118 Ill.Dec. 305, 312 (1988), the fact that the benefits technically flowed to Tucker Master, not to the Tuckers as individuals, does not undermine the analysis.[22] *See also Finn v. Heritage Bank & Trust Co.*, 178 Ill.App.3d 609, 533 N.E.2d 539, 541, 127 Ill.Dec. 667, 669 (1989) (where guarantee agreement is executed contemporaneously with note, consideration for note is sufficient consideration for guarantee). In addition, GECC's assumption and performance of its obligations under the Master Loan Agreement constitutes consideration. *Steinberg*, 371 N.E.2d at 639, 13 Ill.Dec. at 704 (consideration exists in absence of benefit to one party if other assumes burden). The Tuckers' repeated attempt to analyze consideration for § 5.15, apart from that for the Agreement as a whole, must fail. *Chicago Litho Plate Graining Co., Ltd. v. Allstate Can Co.*, 838 F.2d 927, 931 (7th Cir.1988) ("every provision in a contract [need not] have a separately bargained for and stated consideration"). In short, the Tuckers fail to raise a genuine issue of material fact as to lack of consideration. GECC's motion for summary judgment is granted accordingly.

### F. Failure of Condition Precedent

■■■■ The defendants argue that the condition precedent to the enforceability of § 5.15(f), that "the WS Mall Loan not be in default on December 31, 1994[,] was not satisfied," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 26), because the loan was in default on that date.[23] § 5.15 contains no such condition precedent. Instead, § 5.15 provided that, "[i]n the event that the WS Mall Loan *shall not have been paid in full* on or prior to

---

20. Moreover, it is hardly arguable that the overall contractual objectives of the parties have been destroyed. Thanks to the financing provided by GECC pursuant to the Master Loan Agreement, the Tuckers completed their REIT transaction and took their company public, precisely the reason for the Agreement.

21. Even if "[c]onsideration normally flows to a lessor in the form of possession of the premises," (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 18), the Tuckers cite no authority suggesting that possession of the premises is the only form of consideration GECC had to provide to render a contract such as the Master Loan Agreement binding.

22. It borders on the falsehood for the defendants to assert that "the 'benefits' GECC actually con-

ferred on Tucker Master or the REIT in 1993 have no bearing on the Tuckers." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 17.) The Tuckers state that Tucker Master was formed as a vehicle for taking The Tucker Companies public, through the effectuation of the REIT. The Tucker Companies was owned by Kenneth Tucker in the early 1993, precisely the time when the REIT idea began to be explored by the parties.

23. The Tuckers assert two other "conditions precedent," but discuss them under the rubrics of the commercial frustration and the statute of frauds defenses. I have also. *See supra and infra*.

December 31, 1994," the Tuckers agreed to enter into a Master Lease with respect to the WS Mall. If they failed to do so, § 5.15(f) was triggered, whereby the defendants "bec[a]me ... personally obligated." The Tuckers do not dispute that the WS Mall loan remains unpaid or that a Master Lease was never executed.

▆▆ "Conditions precedent ... are not favored by Illinois courts, and contract will not be construed as having conditions precedent unless required to do so by plain, unambiguous language." *Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l B.V.*, 811 F.Supp. 357, 365 (N.D.Ill.1993), *amended on other grounds*, 827 F.Supp. 510 (N.D.Ill. 1993), *aff'd*, 15 F.3d 1419 (7th Cir.1994). Therefore, the Tuckers' argument that the condition precedent is "implicit in § 5.15(e)" is to no avail.[24] (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 26.) Having failed to create a factual issue with respect to the existence of a condition precedent, let alone its failure, the Tuckers cannot withstand GECC's summary judgment motion as to this defense.

### G. Statute of Frauds

▆▆ First, the defendants claim that since the Master Lease, provided for under § 5.15(a), does not exist, it violates the Statute of Frauds and is unenforceable. This may be a sound argument, except that GECC is not seeking to enforce the Master Lease, but the Tuckers' personal obligation set forth in § 5.15(f) of the Master Loan Agreement. There is no dispute that the Agreement itself is in full compliance with the Statute of Frauds.

Second, the defendants argue that § 5.15 is an executory "agreement to agree," i.e., an agreement to lease in the future. They fur-

ther assert that an agreement to lease is invalid under the Statute of Frauds in the absence of a written lease. Thus, they conclude, § 5.15 is invalid. The authority the Tuckers cite in support of this syllogism, *Libby–Broadway Drive–In, Inc. v. McDonald's Sys., Inc.*, 72 Ill.App.3d 806, 391 N.E.2d 1, 3, 28 Ill.Dec. 802, 804 (1979), is inapposite. In *McDonald's Sys.*, the defendants orally promised that if the plaintiffs relinquished an option on one restaurant and sold another, the defendants would grant the plaintiffs comparable franchises. *Id.* 391 N.E.2d at 2, 28 Ill.Dec. at 803. The court held that the defendants' oral promise was unenforceable under the Statute of Frauds, reasoning that there was no difference between enforcing an oral lease and an oral promise to enter into a lease. *Id.* at 4, 28 Ill.Dec. at 805. The instant case is distinguishable from *McDonald's Sys.* because, as argued above, GECC is not seeking to enforce the Tuckers' promise to enter into a Master Lease, embodied in § 5.15(a), but their promise to assume personal liability in the absence of a Master Lease, under § 5.15(f).[25] Thus, there is no genuine issue of fact that the enforcement of § 5.15(f) is barred by the Statute of Frauds, entitling GECC to summary judgment.

### H. Unclean Hands

▆▆ The unclean hands defense is not available in an action at law. *American Nat'l Bank & Trust Co. v. Levy*, 83 Ill. App.3d 933, 404 N.E.2d 946, 948–49, 39 Ill. Dec. 355, 357–58 (1980). GECC's declaratory judgment claim is an action at law since the underlying claim is a breach of contact. *See Moretrench Am. Corp. v. S.J. Groves & Sons Co.*, 839 F.2d 1284, 1286 (7th Cir.1988). Moreover, the unclean hands doctrine re-

---

**24.** The defendants' tortured construction hinges on their assertion that "[s]ection 8.1 of the Third Modification Agreement[, the Master Loan Agreement,] ... does not allow GECC to select multiple remedies where multiple events of default have occurred." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 26.) I have reviewed § 8.1 and do not find support for the Tuckers' contention. In addition, there is strong support in the record that GECC was indeed authorized to pursue multiple remedies in the event of multiple defaults. (First Mortgage § 2.02). Significantly, Richard Tucker recalls neither being told nor seeing in

any document that a condition precedent to the Master Lease obligation was that the WS Mall loan not be in default. (R. Tucker Dep., Vol. I at 125–26.)

**25.** Additionally, unlike the promise of the defendants in McDonald's Sys. to enter into a lease, that of the Tuckers is written and complies with the Statute of Frauds. *Compare Daehler v.. Oggoian*, 72 Ill.App.3d 360, 390 N.E.2d 417, 422, 28 Ill.Dec. 250, 255 (1979) (Statue of Fraud requirements) and § 5.15.

quires a showing of "misconduct [on behalf of the plaintiff] in connection with the very transaction at issue." *Ellis v. Photo Am. Corp.*, 113 Ill.App.3d 493, 447 N.E.2d 852, 856, 69 Ill.Dec. 417, 421 (1983). To show GECC's misconduct, the Tuckers reargue the economic duress and commercial frustration defenses, on which I have granted summary judgment. *See supra.* For these reasons, I do the same with respect to the unclean hands defense.

### I. Failure to Mitigate Damages

■■■ The Tuckers assert that "GECC has the affirmative duty to mitigate whatever damages it claims" and repeatedly state that "GECC offers no evidence whatsoever to support its burden of proof on this issue." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 28, 30.) The defendants misunderstand the allocation of burdens. Failure to mitigate damages is an affirmative defense on which the Tuckers have the burden of proof. *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656, 666 (1969). Mitigating damages means avoiding damages through the exercise of "reasonable effort without undue risk, expense, or humiliation." *Pioneer Bank & Trust Co. v. Seiko Sporting Goods,* 184 Ill.App.3d 783, 540 N.E.2d 808, 812, 132 Ill.Dec. 886, 890 (1989). Thus, it is the Tuckers' task to create a genuine issue of material fact that GECC failed to mitigate, i.e., failed to exercise reasonable effort.

The defendants state that GECC did not insist that the receiver appointed to run the WS Mall "do anything to improve WS Mall's financial performance or minimize the foreclosure period." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 29.) Their evidence is their expert's opinion that "there has been complete abandonment of the plan to improve, expand and develop WSM to maximize its income, competitive position, and overall value." (Marling Supp. Rep., Opinion 7.) However, the defendants do not argue and do not point to evidence showing that GECC's conduct was a failure to exercise reasonable effort under the circumstances.

The Tuckers further claim that since foreclosure, GECC has not implemented "any comprehensive leasing plan or anything else to maximize the income or value of WS Mall." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 29.) The defendants' evidence for this assertion is their expert's statement that "there's a lot of vacancy [in the WS Mall], a lot of boarded up stores." (Marling Dep. at 159.) Not only is this testimony woefully inadequate to substantiate the Tuckers' argument, it sheds no light on the issue at hand, whether GECC failed to exercise reasonable effort under the circumstances.[26]

■■■ "[T]he duty to mitigate may not be invoked by one who has breached a contract as grounds for hypercritical examination of the injured party's conduct, or as evidence that the injured party might have taken steps which seemed wiser or would have been more advantageous to the breaching party." *Pioneer Bank & Trust Co.,* 540 N.E.2d at 813, 132 Ill.Dec. at 891. Accordingly, since the Tuckers have failed to present sufficient evidence from which a reasonable factfinder could conclude that GECC failed to mitigate its damages, plaintiff's motion for summary judgment on this issue is granted.

### J. The Claims are Premature and Speculative

The contention that GECC's damages are premature and speculative amounts to a restatement of arguments I have already rejected, most importantly the meaning of the phrase "all rents which would become due under such a WS Mall Master Lease as provided in Subsection (a) above less amounts received by GECC from occupancy tenants" under 5 .15(f) of the Master Loan Agreement.

■■■ What remains to be addressed is the Tuckers' Motion to Strike Declaration of Lawrence S. Teter. The plaintiff uses the Declaration as evidence that its damages are not speculative. The Tuckers argue that Mr. Teter's Declaration does not comply with Fed.R.Civ.P. 56(e). The rule requires that

---

26. The Tuckers also argue that GECC failed to mitigate by disapproving WS Mall leases in bad faith. I have already disposed of this issue under the rubric of commercial frustration. *See supra.*

the affidavits in support of a motion for summary judgment "be made on personal knowledge;" it does not mandate, as the Tuckers imply, that the affidavits "state that they are made on personal knowledge." Moreover, for the purposes of a summary judgment motion, I can consider evidence if it is admissible at trial. *Northlake Mktg. & Supply, Inc. v. Glaverbel S.A.,* 861 F.Supp. 653, 656 (N.D.Ill.1994). Mr. Teter has been GECC's Investment Manager for six years. The major import of Mr. Teter's Declaration is the calculation of damages. The Declaration details the method he employed and is supported by the Management Summary for the WS Mall, Month Ending December 31, 1995, to which Mr. Teter refers in making his calculation. The Management Summary is admissible as a business record. Fed. R.Evid. 803(6).[27] Consequently, were Mr. Teter to give testimony identical to the substance of the Declaration, such testimony would be admissible at trial.

The Tuckers also argue that the Declaration must be struck and GECC, sanctioned, because, in violation of Fed. R.Civ.P. 26(a)(1) and 26(e), the plaintiff never disclosed to the Tuckers the damages computation method, the evidentiary support for the method and the figures, and the fact that Mr. Teter would be a witness at trial. The Tuckers claim that this failure to disclose "irreparably prejudiced" them because discovery is

closed and they cannot depose Mr. Teter. (Defs.' Mot. to Strike at 9.)

Underlying the Tuckers' prejudice argument is the notion that Mr. Teter's Declaration unfairly surprised them. This cannot be the case. Mr. Teter's Declaration relies on a formula which GECC has maintained to be the interpretation of § 5.15(f) from the outset of this suit. The formula utilizes data which, GECC claims, it produced to the Tuckers months ago.[28] The Tuckers had the opportunity to challenge these figures, but have not done so.[29] The Tuckers have not explained what deposition of Mr. Teter would accomplish that the defendants could not have accomplished previously.[30] Accordingly, I deny the Tuckers' Motion to Strike Declaration of Lawrence S. Teter.[31]

### Conclusion

For the reasons stated above, the defendants' motion for summary judgment is denied and the plaintiff's motion for summary judgment is granted.[32] Plaintiff is given until October 17, 1997 to provide a statement of damages supported by affidavit as well as a proposed form of judgment. Defendants will have until November 14, 1997 to file a response. Status is set for November 21, 1997, at 10:00 a.m.

---

27. Moreover, in its Response to the Tuckers' Motion to Strike, GECC submits a Declaration by Mary G. Killion, a Controller at Landau & Heyman, the receiver managing the WS Mall. The Management Summary was prepared under Ms. Killion's direction and her Declaration is identical to Mr. Teter's.

28. Furthermore, in a July 25, 1996 letter, GECC informed the Tuckers' counsel that the plaintiff intended to call Mary G. Killion, the Controller for Landau & Heyman, GECC's receiver running the WS Mall. The letter described specifically what Ms. Killion would testify to and the materials and figures upon which she would rely. Ms. Killion's testimony and supporting documentation are identical to those of Mr. Teter with respect to the damages for 1995. GECC has provided Ms. Killion's Declaration as a substitute for Mr. Teter's.

29. The July 25, 1996 letter, *supra* note 30, offered to "make Ms. Killion available for deposition should [the Tuckers] so desire." The Tuck-

ers admit that non-expert discovery closed on July 30, 1996. They do not argue that they were unable to depose Ms. Killion.

30. In Regarding the Tuckers' contention that GECC had not identified Mr. Teter *as a witness*, the Tuckers do not cite and I could not find authority requiring such identification at this stage in litigation.

31. The Tuckers wisely do not press their lack of subject matter jurisdiction defense. As set forth in Mr. Teter's Declaration, see supra, GECC's damages for 1995 alone, over $1 million, are well in excess of the jurisdictional requirement, and the diversity of citizenship of the parties is not disputed.

32. The plaintiff's Motion to Strike Jury Trial Demand is, accordingly, denied as moot.