In re PRE–PRESS GRAPHICS COMPANY, INC., d/b/a R & B Group, an Illinois Corp., Debtor.

Pre–Press Graphics Company, Inc., d/b/a R & B Group, an Illinois Corp., Plaintiff and Counter–Defendant,

v.

Brides Noir, LLC, Dana Powell, and Shannon Bonner, Defendants and Counter–Plaintiffs.

Bankruptcy No. 02 B 08292.
Adversary No. 03 A 04400.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 22, 2004.

Jeffrey C. Dan, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Debtor/Plaintiff.

Darryl Tom, Burris, Wright, Slaughter & Tom, LLC, Chicago, IL, for Defendant.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

These matters come before the Court on the complaint of Pre–Press Graphics Company, Inc. ("Pre–Press") for breach of contract and enforcement of guaranty against Brides Noir, LLC, Dana Powell, and Shannon Bonner (collectively, "Defendants") and on Defendants' counterclaim for breach of contract against Pre–Press. After conducting a bench trial, examining the admitted exhibits, and reviewing the testimony, the Court finds that the contract at issue is valid and enforceable, that Pre–Press satisfied its obligations under the agreement, and that Defendants failed to perform all of their contractual duties. Accordingly, the Court enters judgment in favor of Pre–Press, dismisses Defendants' counterclaim, and orders Defendants to pay Pre–Press the aggregate sum of $38,467.00, the amount due and owing under the relevant contractual agreement.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (O).

### II. FACTS AND BACKGROUND

Pre–Press Graphics Company, Inc., doing business as R & B Group, operates a film imaging and printing business. On March 4, 2002, Pre–Press filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Compl. at ¶ 5. Subsequently, in July 2002, Dana Powell ("Powell") and Shannon Bonner ("Bonner") met with Pre–Press sales account representative Dana Kurth[1] to discuss the publication of their inaugural issue of *Brides Noir*, a bridal magazine designed to address the needs and interests of African American women. Joint Pre–Trial Statement at p. 4. Brides Noir, LLC ("Brides Noir") is a limited liability corporation organized under the laws of the state of Illinois. Compl. at ¶ 7. Powell and Bonner are members and co-owners of Brides Noir and responsible for the operation and business affairs of the company. *Id.* at ¶ 8.

The parties acknowledge that they reached some sort of oral agreement prior to the signing of a written contract in October, although they dispute the precise terms of that oral arrangement. According to Defendants, the parties orally agreed that Defendants would remit three installment payments of $10,000.00 each, to be paid 60, 90, and 120 days of delivery, in exchange for 12,000 152–page magazines, which Pre–Press was to print, bind, and distribute to locations specified by Defendants by October 4, 2002. Joint Pre–Trial Statement at p. 4. In contrast, the recital portion of the subsequently executed written contract states that the parties orally agreed that the total cost for both printing

---

1. In the parties' joint pre-trial statement, Defendants note that the Pre–Press sales representative's name is Dana Kurtz. *See* Joint Pre-Trial Statement at p. 4. However, in a letter dated November 25, 2002 to Bonner from Pre–Press president Robert Beevers, the sales employee is referred to as Dana Kurth. *See* Pre–Press's Ex. & Witness List, Ex. C. Because the account representative is employed by Pre–Press, the Court presumes that Pre–Press has accurately identified her.

and binding the magazines would be $43,304.00, payable in three installments of $14,434.67, $14,434.67, and $14,434.66 within 60, 90, and 120 days of distribution.[2] Compl., Ex. A, Agreement, at p. 1.

On or around September 27, 2002, Pre–Press president Robert Beevers ("Beevers") called for a meeting with Powell and Bonner, at which time he asked for partial payment before completing the magazine production work. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 3. Shortly thereafter, on October 1, 2002, Beevers presented Defendants with a written Printing and Distribution Agreement (the "Agreement"), which differed from the prior oral arrangement in several ways. *Id.* at ¶ 4. Specifically, the Agreement provided that Pre–Press would print the magazine pages but that another firm, Booklet Binding, Inc. ("Booklet"), would do the binding:

> Seller [ (Pre–Press) ] shall print, including prepress assemble and pagination from supplied keyline with high res images placed, one set of fiery proofs and one set of final proofs for approval, bindery trim, score, fold, perfect bound, blow in subscription card and carton, and deliver the Magazines no later than 1:00 p.m. on October 2, 2002, to Booklet Binding, Inc. . . . .

Compl., Ex. A, Agreement, at p. 1.

In addition, the payment terms provided for under the Agreement deviated from those that the parties had allegedly agreed to orally. First, pursuant to the Agreement, Pre–Press was to receive $39,467.00 for printing the magazine pages. *Id.* at p.

2. Further, Defendants were required to remit a "good faith payment" of $1,000.00 upon the signing of the Agreement, with the balance to be paid in three installments of $12,822.34, $12,822.33, and $12,822.33 in 60, 90, and 120 days after delivery of the magazines to the binding company. *Id.* Finally, the Agreement indicated that the total cost for binding the magazines was $4,137.00, which Defendants were to pay directly to Booklet. *Id.*

As of or on October 2, 2002, the parties executed the contract, with Beevers and company vice president Michael Zienty signing for Pre–Press and Powell and Bonner signing on behalf of Brides Noir. Compl. at ¶ 9 & Ex. A, Agreement, at p. 4. On the same day, Powell and Bonner executed a personal guaranty (the "Guaranty"), which provided that each of them "guarantee[d] the obligations of Buyer [(Brides Noir)] under the foregoing Agreement, subject to any defenses available to Buyer." Compl., Ex. A, Guaranty, at p. 5. They also made a $1,000.00 deposit as required under the Agreement. Compl. at ¶ 13.

The parties dispute the events that occurred on October 2 and 3, 2002. Pre–Press contends that the magazines were printed and delivered to Booklet by 1:00 p.m. on October 2, 2002 as required pursuant the Agreement. Compl. at ¶ 12; Joint Pre–Trial Statement at p. 2. Defendants admit that the pages were delivered to the bindery on October 2 as promised; however, they claim that Pre–Press subsequently took the magazines back and redelivered them on October 3, 2002, only after Defendants had signed the contract. Defen-

---

**2.** The Court cannot definitively attribute the statements in the recital section of the written contract to Pre–Press, because, remarkably, the parties dispute the identity of the drafter of the written contract. At trial, Robert Beevers, president of Pre–Press, testified that the attorney for Brides Noir prepared the document. Subsequently, Bonner stated under oath that counsel for Defendants did not draw up the contract. In any case, the exact terms of the oral agreement have no bearing on the resolution of this matter, as discussed below.

dants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 6; Joint PreTrial Statement at p. 5. They further allege that this delay in delivery caused the glue to set improperly and that, accordingly, all of the magazines were defectively bound and fell apart, resulting in lost subscription revenue, lost profits, and loss of goodwill. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 7. Both parties agree that Defendants never paid the balance due to Pre–Press under the written Agreement. Answer at ¶ 15. According to Defendants, their distributors expected 10,000 copies of the magazine by October 4, 2002 for national distribution; the remaining two thousand were needed for purposes of promotion at Defendants' launch party on the same day, as well as for subscription fulfillment. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 2, ¶ 2. Despite the fulfillment requirement, Defendants assert that enough pages for only 11,756 magazines were delivered for binding, leaving them 244 books short. *Id.* at ¶ 8.

On October 24, 2003, Pre–Press filed a two-count complaint for breach of contract and enforcement of guaranty, seeking payment from Defendants of $38,467.00, the amount due and owing pursuant to the Agreement. Subsequently, on November 25, 2003, Defendants filed their answer,

asserting three affirmative defenses.[3] Almost two weeks later, on December 8, 2003, Defendants filed a counterclaim for breach of contract against Pre–Press. They contend that Pre–Press breached the Agreement by failing to deliver to Booklet a sufficient number of pages for the binding of 12,000 magazines and by neglecting to immediately refund Defendants' $1,000.00 deposit. Counterclaim at ¶ 6. Defendants also suggest that Pre–Press failed to perform "in a good and workmanlike fashion consistent with customary standards of quality" as required under the Agreement. They claim that their damages exceed $40,000.00. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at pp. 3–4, ¶¶ 8–11. A trial was held before the Court on May 6, 2004.

### III. DISCUSSION

 State law determines the rules governing contractual disputes. *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir.1998) (citations omitted). The Agreement in this matter expressly states that it is governed by the laws of the state of Illinois,[4] and the parties do not contest that Illinois contract law controls.[5] Thus, the Court looks to Illinois law in resolving the instant dispute. *See Freund v. E.D. & F. Man Int'l, Inc.*, 199 F.3d 382, 383 (7th Cir.1999) (applying the law of the state

---

**3.** The three affirmative defenses are as follows:
 (1) Pre–Press breached the Agreement.
 (2) Pre–Press failed to mitigate its damages.
 (3) The Agreement and Guaranty are void as Defendants signed the Agreement and Guaranty under threat of economic duress by Pre–Press.
 Answer at p. 8.

**4.** The applicable provision of the contract reads as follows: "This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Illi-

nois, and all rights and remedies shall be determined under such laws, without regard to principles of conflict of laws." Compl., Ex. A, Agreement, at ¶ 8.

**5.** In fact, Pre–Press has failed to cite *any* law, Illinois or otherwise, in support of its allegations. Defendants cite and rely on only two cases in asserting the affirmative defense of economic duress, both of which come from the Seventh Circuit. *See* Defendants' Ex. & Witness List & Proposed Findings of Fact & Conclusions of Law at p. 4.

that the parties agreed controlled the contract).

■ Pre–Press's complaint contends that the Agreement and Guaranty are valid contracts, which Defendants breached by failing to pay the amount owed for the magazine production work performed by Pre–Press. Under well-settled Illinois law, an action for breach of contract requires proof of four elements: (1) the existence of a valid and enforceable contract; (2) performance of the contract by the plaintiff; (3) breach by the defendant; and (4) a resulting injury to the plaintiff. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F.Supp.2d 974, 976 (N.D.Ill.2002) (*citing Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001)); *Applied Indus. Materials Corp. v. Mallinckrodt, Inc.*, 102 F.Supp.2d 934, 937 (N.D.Ill.2000) (citations omitted); *Henderson–Smith & Assoc., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 323 Ill. App.3d 15, 256 Ill.Dec. 488, 752 N.E.2d 33, 43 (Ill.App.Ct.2001) (citation omitted). Accordingly, in order to prove a prima facie breach of contract claim, Pre–Press must show that the Agreement and Guaranty were valid contracts; that Pre–Press performed its contractual duties; that Defendants failed to meet their obligations under the Agreement; and that Pre–Press suffered damages as a result of Defendants' breach.[6] *See Intervisual Communications, Inc. v. Volkert*, 975 F.Supp. 1092, 1099 (N.D.Ill.1997) (citation omitted).

The parties do not contest two of the four breach of contract requirements in this matter. Specifically, the third element, breach by Defendants, is not in dispute. According to the terms of the Agreement, Defendants were to provide Pre–Press with an earnest money payment of $1,000.00 upon execution of the contract, with the balance to be paid in three subsequent installments:

(b) Upon the signing of this Agreement, Buyer [ (Brides Noir) ] shall make to Seller [ (Pre–Press) ], via check, a good faith payment for application to the . . . Total Cost in the amount of one thousand dollars ($1,000). This one thousand dollar ($1,000) payment shall be deducted from the . . . Total Cost. . . .

(c) The balance of the . . . Total Cost . . . shall be paid by Buyer in three installment payments, the first payment of twelve thousand eight hundred twenty-two dollars thirty-four cents ($12,-822.34) being due sixty (60) days after the Magazines are delivered to Booklet by Seller (the "New Payment Date"), the second payment of twelve thousand eight hundred twenty-two dollars thirty-three cents ($12,822.33) being due ninety (90) days after the New Payment Date and the third and final payment of twelve thousand eight hundred twenty-two dollars thirty-three cents ($12,-822.33) being due one hundred twenty days (120) after the New Payment Date.

Compl., Ex. A, Agreement, at ¶ 2. The parties on both sides acknowledge that Defendants made the required good-faith payment of $1,000.00 after signing the Agreement. Answer at ¶ 13. It is also uncontested that Defendants never paid Pre–Press the balance of $38,467.00 for the magazine production work. *Id.* at ¶ 15. Accordingly, Defendants breached the Agreement by failing to pay any of the balance due.

Similarly, the parties do not contest that Pre–Press was injured as a result of Defendants' breach. At trial, Beevers testi-

---

**6.** The enforceability of the Guaranty executed by Powell and Bonner is entirely dependent on the validity of the Agreement. Accordingly, the Court confines its attention and analysis to the validity of the Agreement.

fied—and Defendants do not dispute—that Pre–Press suffered monetary damages by reason of Defendants' failure to pay for the printed magazine pages delivered to the binder. Specifically, Beevers asserted that Pre–Press incurred various costs in connection with the production of the pages, including out-of-pocket expenses, shipping costs, direct labor expenditures, and outlays for paper, ink, chemicals, plates, and film. Thus, Pre–Press has established that Defendants' breach caused injury to the printing company.

In contrast, the validity of the Agreement and the question of whether Pre–Press performed its obligations under the contract are very much in dispute. The Court examines each of these elements in turn.

## A. The Validity of the Agreement

■ It is well-settled in Illinois that formation of a contract requires an offer, acceptance, and consideration. *Church Mut. Ins. Co. v. Mount Calvary Baptist Church (In re Mount Calvary Baptist Church)*, 162 B.R. 181, 184 (Bankr.N.D.Ill. 1993) (citation omitted). More specifically, an enforceable agreement exists when the following requirements have been satisfied: valid subject matter, competent parties, legal consideration, mutuality of obligation, and mutuality of agreement. *Longview Aluminum, L.L.C. v. United Steel Workers of Am.*, 213 F.Supp.2d 876, 879–80 (N.D.Ill.2002) (citation omitted). Further, Illinois courts hold that a valid contract is one whose essential terms are certain and definite. *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, No. 91–C–6103, 1994 WL 687579, at *17 (N.D.Ill. Dec. 7, 1994) (*citing Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61, 65 (1987)). Finally, there must be a meeting of the minds about the existence of a contract, as well as its terms. *Mount Calvary Baptist Church*, 162 B.R. at 184 (citation omitted).

The parties do not dispute that the Agreement meets most of the requirements of a contract, but they vigorously contest whether there was mutuality of agreement. That is, Defendants contend that the oral understanding that the parties allegedly reached prior to the execution of the written contract reflects the terms to which they actually agreed. Defendants suggest that because the Agreement materially alters the terms of the oral understanding, the written contract is legally invalid. In addition, Defendants claim that both the Agreement and the Guaranty are void, because Defendants signed them under the threat of economic duress by Pre–Press.

### 1. Material Alteration of the Oral Agreement

■ In the examination of contracts, the overriding concern is to give effect to the intent of the parties. *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996) (citation omitted). Conventional contract principles in Illinois require that " '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.' " *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir.2003) (*citing W. Ill. Oil Co. v. Thompson*, 26 Ill.2d 287, 186 N.E.2d 285, 287 (1962)); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999) (citation omitted). Accordingly, Illinois courts use the "four corners" approach to contract interpretation, confining their attention to only that which appears within the four corners of the relevant document. *Bourke v. Dun & Bradstreet Corp.*, 159

F.3d 1032, 1036 (7th Cir.1998) (citation omitted); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873–74 (7th Cir.2001) (citation omitted) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in interpreting its meaning"). In construing a contract, a court may not consider evidence of either a prior agreement or a contemporary oral understanding that would belie the written document. *Cromeens*, 349 F.3d at 394 (citation omitted).

■■ The only exception to this rule is applied in situations in which a contract is ambiguous. *Id.* (citation omitted). A written instrument is ambiguous if the language used is reasonably susceptible to having more than one meaning. *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1137–38 (7th Cir.2001) (citations omitted); *Bourke*, 159 F.3d at 1036 (citation omitted); *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir.1996) (citation omitted) ("When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous."); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995) (citation omitted) ("[A] contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract."). In contrast, a contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir.1998) (citation omitted); *Murphy*, 61 F.3d at 565 (citation omitted). Where a contract's provisions are clear, a court will enforce them according to their ordinary and plain meaning. *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir.2000) (citation omitted); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir.1998)

(citation omitted); *Bourke*, 159 F.3d at 1036 (citation omitted).

■ Applying these well-established contract principles, the threshold inquiry is whether the controlling contractual document in this matter is clear or ambiguous. It is well established that this determination is a question of law. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000) (citation omitted); *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 772 (7th Cir.2000) (citations omitted).

■ In the present matter, the Court finds that the Agreement is facially clear, complete, and unambiguous. The contract begins by indicating the date of the Agreement and identifying the parties executing it. The provisions that follow include straightforward, direct language clearly setting forth the mutual obligations of both parties, as well as various other contractual terms and conditions not at issue here. *See* Compl., Ex. A, Agreement.

Particularly pertinent to the matter at bar, the Agreement also contains several provisions that directly or impliedly concern the oral understanding purportedly reached by the parties. Specifically, the recital section delineates the terms of the oral agreement, including the performance and payment obligations of the parties. *Id.* at p. 1. Of particular significance are the two provisions that conclude the section:

WHEREAS, the Parties desire to change the terms of their oral agreement and memorialize their agreement in its entirety as provided herein.

NOW, THEREFORE, in consideration of the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

*Id.* These provisions, while acknowledging the existence of a prior oral arrangement, explicitly state the parties' intent to alter the terms of that arrangement and expressly assert that the parties have mutually agreed to the terms of the written contract.

 Moreover, the provision entitled "Entire Agreement" is an "integration" or "merger" clause that expressly provides that the contract represents the parties' entire agreement and all communications between them, whether oral or written.[7] "Written contracts are presumptively complete in and of themselves." *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 707 (7th Cir.2001) (citation omitted). However, when an integration clause is present, this presumption is all the more stronger. *Id.* (citation omitted). Indeed, the very purpose of a merger clause is to make the written agreement the exclusive statement of the parties' obligations and rights. *Anheuser–Busch, Inc. v. Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing, Charter Bus Drivers, Gen. Promotions Employees, & Employees of Affiliated Indus., Maltster, Laborers, Syrup, Yeast, Food, Vinegar, Brewery, Recycling & Miscellaneous Workers of Chi. & Vicinity, Ill., Local Union No. 744, Affiliated with the Int'l Bhd. of Teamsters*, 280 F.3d 1133, 1141 (7th Cir.2002) (citation omitted). Parties that formally incorporate a merger clause into their contract "explicitly [manifest] their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety*, 236 Ill.Dec. 8, 706 N.E.2d at 885.

During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null.

*Id.* (emphasis in original).

 The added presence of the integration clause in this matter is further strong evidence that the parties intended the Agreement to be the complete and exclusive agreement between them. *See Longview Aluminum*, 213 F.Supp.2d at 880 (finding that an intent to be bound by a contract can be shown "by the inclusion of an explicit merger clause in the agreement"). Along the same vein, the inclusion of the clause supports the contention that the parties desired the Agreement to be interpreted solely according to the language used in the final written contract. *See Air Safety*, 236 Ill.Dec. 8, 706 N.E.2d at 886. All parties were free to negotiate a contract without a merger clause, but they did not. Courts presume that each provision in a contract was inserted deliberately and for a reason. *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 900 (7th Cir.1996) (citation omitted).

 Because the face of the Agreement indicates no ambiguity with respect to the parties' intent that the contract be

---

7. The "integration" clause reads as follows: "6. Entire Agreement. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior written or oral agreements and understandings between the Parties with respect to the subject matter hereof." Compl., Ex. A, Agreement, at pp. 2–3.

the exclusive expression of their complete agreement, the signatories are bound by that writing. *See Robbins v. Lynch,* 836 F.2d 330, 331 (7th Cir.1988) (citations omitted); *Conway Corp. v. Ahlemeyer,* 754 F.Supp. 596, 601 (N.D.Ill.1990) (citation omitted) ("Because no ambiguity ... exists, 'the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself, not by the construction placed upon it by the parties.'"); *Int'l Ins. Co. v. Peabody Int'l Corp.,* 747 F.Supp. 477, 480 (N.D.Ill.1990) (citation omitted) (finding that when the language of an agreement is unequivocal, the signatory to the contract is bound by its ordinary meaning); *Basu v. Stelle,* 237 Ill.App.3d 113, 177 Ill.Dec. 879, 603 N.E.2d 1253, 1256 (Ill.App.Ct.1992). Defendants may not properly rely on the alleged oral agreement and thereby avoid their contractual obligations by claiming that they signed the Agreement with their fingers crossed behind their backs. *See Robbins,* 836 F.2d at 332. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens,* 349 F.3d at 394 (citation omitted).

In sum, after a thorough examination of the controlling document, the Court finds that the Agreement is without ambiguity and admits of no doubts or misunderstanding. Indeed, Defendants have urged only that the Court accept the terms of the oral agreement purportedly reached by the parties; they have not claimed that the Agreement's provisions are ambiguous.

"[W]hen the language employed [in a contract] is unequivocal, although the parties may have failed to express their real intention, there being no room for construction, the legal effect of the instrument will be enforced as written.

Intention of the parties is not to be determined from previous understandings or agreements, but must be ascertained from the instrument itself, which they execute as their final agreement; otherwise, written evidence of an agreement would amount to nothing."

*Eagle Fire Ins. Co. v. John Spry Lumber Co.,* Gen. No. 13,616, 138 Ill.App. 609, 1908 WL 1450, at *1 (Ill.App.Ct.1908) (*quoting Clark v. Mallory,* 185 Ill. 227, 56 N.E. 1099, 1100–01 (1900)). Accordingly, the Court rejects Defendants' contention that the parties' understanding was an agreement in principle, embodied by the oral agreement, but rather finds that the parties are bound by the written contract.

**2. Economic Duress**

▉▉▉ A contract can be voided where its execution was obtained through illegality, mistake, fraud, or duress. *Hurd v. Wildman, Harrold, Allen & Dixon,* 303 Ill.App.3d 84, 236 Ill.Dec. 482, 707 N.E.2d 609, 614 (Ill.App.Ct.1999) (citation omitted). As such, Defendants contend that the Agreement and Guaranty at issue were executed under duress and are, therefore, unenforceable. It is well-settled that economic duress is a recognized affirmative defense to a contract action. *Resolution Trust Corp. v. Ruggiero,* 977 F.2d 309, 313 (7th Cir.1992) (citation omitted); *Fed. Deposit Ins. Corp. v. Linn,* 671 F.Supp. 547, 556 (N.D.Ill.1987) (citation omitted). Thus, Defendants bear the burden of persuasion. *Linn,* 671 F.Supp. at 551 (citation omitted). "Duress is a defense to obligations to which a party would not otherwise agree, were it not for the other party's wrongful and oppressive demands." *Id.* at 557 (citation omitted). More specifically, economic duress, also known as business compulsion, includes the oppression, undue influence, imposition, or taking of undue advantage of the business or finan-

cial stress or extreme weakness or necessities of another, such that his "free agency is overcome." *Ficke v. Johns,* No. 95–C–939, 1996 WL 99424, at *4 (N.D.Ill. Mar. 4, 1996) (citations omitted); *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Stanley,* 606 F.Supp. 558, 562 (N.D.Ill.1985) (citation omitted). In Illinois, a contract executed under duress is voidable. *In re Dalip,* 194 B.R. 597, 601 (Bankr.N.D.Ill.1996). To invalidate a contract on the basis of economic duress, a party must show that it was (1) induced by a wrongful act or threat of another to execute that contract, (2) under circumstances that deprived the party of its free will. *Riv Vil, Inc. v. Tucker,* 979 F.Supp. 645, 655 (N.D.Ill.1997) (citations omitted); *Westinghouse Elec. Corp. v. McLean,* 938 F.Supp. 487, 492–93 (N.D.Ill. 1996) (citations omitted); *Hurd,* 236 Ill. Dec. 482, 707 N.E.2d at 614 (citations omitted).

 Wrongful acts that can constitute economic duress include not only those that are tortious, criminal, or violative of a contractual duty, but also acts that are wrongful in a moral sense. *Dalip,* 194 B.R. at 601 (citation omitted); *Alexander v. Standard Oil Co.,* 97 Ill.App.3d 809, 53 Ill.Dec. 194, 423 N.E.2d 578, 582 (Ill. App.Ct.1981) (citation omitted). However, "[i]t is not wrongful to threaten to do something that one has a legal right to do." *Riv Vil,* 979 F.Supp. at 656 (*citing Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 582); *Thelin v. Mitchell,* 576 F.Supp. 1404, 1408 (N.D.Ill.1983) (citations omitted) (finding that a party's threat to assert its legal rights does not rise to the level of economic duress unless it involves some abuse of the legal process). Unless wrongful or unlawful pressure is exerted, there is no economic duress. *Hurd,* 236 Ill.Dec. 482, 707 N.E.2d at 615 (citation omitted); *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted) (finding

that a claim based on economic duress " 'cannot be predicated on a demand which is lawful or on the insistence of a legal right' ").

 Defendants claim that Pre–Press took advantage of the fact that Brides Noir was in serious economic straits, thereby inducing Powell and Bonner to sign both the Agreement and the Guaranty. At trial, Bonner testified that *Brides Noir* was a new publication and that, therefore, Defendants had limited funds. According to Bonner, Defendants decided to do business with Pre–Press precisely because the printing company provided Defendants with lenient credit terms and did not require a down payment before beginning production work on the magazine pages. Bonner testified that about a week before the October 4 launch party for the magazine, Beevers called an emergency meeting at which he asked for $10,000.00 up front before he would allow the rest of the pages to be printed, despite the terms to which the parties had purportedly agreed to orally. Bonner asserted that Defendants' attorney received the written contract from Beevers. several days later and that she and Powell signed it only because they felt forced to reach some sort of agreement. Bonner also testified that Beevers subsequently told Defendants that he still would not print unless Powell and Bonner signed a personal guaranty.

 Neither this testimony nor any other evidence presented establishes any wrongful or unlawful conduct by Pre–Press. Pre–Press had the legal right to bargain for the best possible terms in exchange for its printing services, including demanding that Defendants sign a written contract and assume personal liability in connection with the payment of those services. Defendants should not have expected Pre–Press to perform without some

assurance that it would be paid. The fact that Pre–Press may have engaged in hard bargaining is not sufficient to constitute a wrongful act for purposes of establishing economic duress. *See Dalip*, 194 B.R. at 601–02. A party cannot charge another with economic duress where consent to an agreement is obtained as the result of hard bargaining positions or the pressure of financial circumstances. *Resolution Trust*, 977 F.2d at 314 (citation omitted) ("[T]he mere fact that one is in a difficult bargaining position due to desperate financial circumstances does not support a defense of economic duress."); *Dalip*, 194 B.R. at 602 (citation omitted); *Alexander*, 53 Ill.Dec. 194, 423 N.E.2d at 582.

Moreover, duress does not exist where business stress or financial pressure is the result of a party's own decisions and general economic conditions. *Resolution Trust*, 977 F.2d at 314; *Selmer Co. v. Blakeslee–Midwest Co.*, 704 F.2d 924, 928 (7th Cir.1983); *Alexander*, 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted). Defendants were completely aware of the terms to which they were agreeing under the written contract and the Guaranty. The concessions that they made were, undoubtedly, the result of hard bargaining by Pre–Press. However, if Defendants felt obligated to yield any rights to Pre–Press, that compulsion was caused by Defendants' own financial situation—not by Pre–Press's legitimate efforts to get concessions from them in return for Pre–Press's own concessions.

Finally, the disparity of the parties' size, experience, or bargaining power does not support Defendants' contention that Pre–Press acted wrongfully or unlawfully. Bonner testified at trial that she had no prior knowledge of publishing or magazine production at the time the events in this matter took place. In contrast, Beevers testified that he has worked at Pre–Press for 15 years. Nevertheless, Illinois courts have found that one cannot rely on disparity in size of the parties entering into an agreement to show economic duress. *Linn*, 671 F.Supp. at 560 ("Disparities in bargaining strength do not equate with—or even provide prima facie evidence of—coercion."); *Alexander*, 53 Ill. Dec. 194, 423 N.E.2d at 583. "The mere presence of economic power, without some wrongful use of that power, does not in and of itself constitute economic duress." *Alexander*, 53 Ill.Dec. 194, 423 N.E.2d at 583 (citations omitted).

In addition to having failed to show that Pre–Press engaged in any wrongdoing, Defendants are unable to establish that they were left "bereft of the quality of mind essential to the making of a contract." *Alexander*, 53 Ill.Dec. 194, 423 N.E.2d at 583. Defendants suggest that they had no choice but to sign the Agreement and Guaranty in response to Pre–Press's demands. Although the Court does not doubt that Defendants were between a rock and a hard place when presented with the documents, the evidence indicates that they made a calculated, economic decision not to fight Pre–Press over the contractual terms. Instead, they entered into the written Agreement to ensure the production and delivery of the magazines both in satisfaction of their distributors' schedules and in time for the launch party celebrating the new publication. Defendants were motivated by economic self-interest—not the involuntary result of pressure. Proscribed economic duress does not exist when the party claiming the duress had a choice as to whether he would perform the act or do the thing said to have been done under duress. *Wittkoff v. USG Corp.*, No. 89–C–6004, 1989 WL 135242, at *2 (N.D.Ill. Oct. 24, 1989) (citation omitted).

Further, the evidence indicates that Defendants were fully aware of what they were signing and that they had access to and consulted with an attorney before executing the Agreement. These factors, while not dispositive, are important in rebutting a claim of economic duress. *Linn*, 671 F.Supp. at 561 n. 34; *Alexander*, 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted).

In sum, the facts of this matter do not present a situation of economic duress. That Defendants were not able to secure the terms that they desired through negotiation does not mean that they can now avoid their obligations under the written document by claiming that they agreed to the contract under economic duress. "In our free market system, it is not the function of the judiciary to measure economic adversaries' bargained concessions in retrospect." *Linn*, 671 F.Supp. at 561. Accordingly, the Court concludes that the Agreement and Guaranty are valid and enforceable, and Defendants are bound by the terms of the documents.

## B. Pre–Press's Performance of Its Contractual Obligations

 The Court now turns to the other breach of contract element contested by the parties—whether Pre–Press performed its obligations under the Agreement. Pre–Press claims that it fulfilled its contractual obligations to the letter. In contrast, Defendants contend that Pre–Press breached the Agreement by producing an insufficient number of magazine pages and by failing to deliver those pages in a timely manner.[8]

With respect to the number of pages produced, Defendants allege that Pre–Press breached the Agreement by failing to create and deliver to the bindery enough sheets for the production of 12,000 magazines. Bonner testified at trial that 10,000 of the magazines were sent to Defendants' distributors for national distribution. The remaining books were to be used for promotional purposes to generate interest, as well as for subscription fulfillment. Both Powell and Bonner testified that only 11,756 magazines were ultimately bound, leaving them short 244 books. As a result, Defendants allege that they were unable to fulfill all of their subscriptions.

Beevers testified at trial that Pre–Press did not produce enough pages for *exactly* 12,000 magazines. Instead, Beevers said, Pre–Press printed sheets for *more than* 12,000 books for all pages except the magazine cover and the subscription cards. He explained that it is industry standard to print more than enough sheets for "make-ready" when a fulfillment requirement is involved, because the production

---

8. Pre–Press alleges in its complaint that "[t]he Debtor [(Pre–Press)] printed the magazines and delivered same on October 2, 2002." Compl. at ¶ 12. In copying this paragraph in order to respond to it, Defendants make two surprising and rather significant errors. That is, the allegation appears in Defendants' answer as follows: "The Debtor printed and bound the magazines and delivered same on October 4, 2002." Answer at ¶ 12. Defendants then provide an equally enigmatic answer: "Defendants admit that Plaintiff [(Pre–Press)] printed and bound a portion of the 12,000 magazines pursuant to the Agreement, but deny the remaining allegations contained in paragraph 12 of Plaintiff's Complaint." *Id.* Under the Agreement, Pre–Press was obligated only to print the pages—not to bind the magazines—and to deliver them to Booklet by October 2, 2002. At trial, the parties on both sides agreed that Pre–Press did not perform any binding. They also acknowledged that the pages were delivered, at least initially, to Booklet on October 2, 2002. See the discussion that follows. The Court presumes that Defendants' references to Pre–Press binding the magazines and to October 4, 2002 are simply typographical and proofreading errors.

process always entails some waste. According to Beevers, the standard and practice in the printing business is to produce five to 10 percent overage, depending on the complexity of the job, and he asserted that Pre–Press regularly conforms to this standard.[9] Beevers also testified that every page is counted by the printing press as it is created.

Pre–Press's Exhibit B, entitled "Shipper/Packing List," corroborates Beevers' testimony. *See* Pre–Press's Ex. & Witness List, Ex. B. Specifically, the document indicates that, with the exception of the cover and subscription cards, more than 12,000 sheets for all magazine pages were shipped to Booklet. In fact, the number of pages in excess of 12,000 for each of the nine forms ranged from 600 to 1,500 pages, representing five to 12.5 percent more than the required number under the Agreement.

The testimony of Elena Morena ("Morena") also bolsters Beevers' assertions. Employed by Booklet, Morena served as the customer service representative on the *Brides Noir* job. In discussing the binding sequence, she testified that after Booklet employees receive a job, they cut the forms, fold them, and then put them into the binder. Morena acknowledged that each process results in a certain amount of spoilage. A memo from Morena to Defendants, dated October 11, 2002, notes merely as follows: "Attached you will find over stock counts for the Brids (sic) Noir book[.] I have contacted Dana @ R & B Group regarding shortages." Beevers addressed these shortages in a letter sent to

Bonner on November 25, 2002. The letter reads in pertinent part as follows:

> As we discussed, all the sheets necessary to produce the required number of books were delivered to Booklet Binding and signed for by its representative. It is my understanding that Jack Mikolajczak and Dana Kurth have each spoken with Booklet employees who have acknowledged missing the target number of Brides Noir books to be bound. The Booklet employees have acknowledged, however, that the production shortage has everything to do with Booklet and nothing to do with R & B Group.

Pre–Press's Ex. & Witness List, Ex. C. In addition to following up on the problems related to the alleged shortages, Beevers told Defendants that Pre–Press was prepared to go back on press immediately and noted that he would "make every effort to keep [Defendants'] costs for ... a reprint to an absolute minimum." *Id.* In short, the documentary evidence corroborates Beevers' testimony and establishes that Pre–Press not only provided a sufficient number of pages for the production of 12,000 magazines, but also attempted to ameliorate the shortage problems that occurred as a result of waste during the binding of the books.

The evidence in this matter also weighs in favor of Pre–Press with respect to whether the magazine pages were delivered to Booklet in a timely manner. Pre–Press asserts that the pages were printed and shipped to Booklet by 1:00 p.m. on October 2, 2002, in accordance with the Agreement. Beevers testified that the

---

9. Although Beevers offered evidence of printing industry standards and practices, Pre–Press did not identify or qualify him as an expert witness. Therefore, his testimony here should be used only to demonstrate his own experience, not to establish industry custom. *See Suncraft Techs., Inc. v. Zirkon Druckmaschinen GMBH*, No. 99–C–1456, 2000 WL 283970, at *5 (N.D.Ill. Mar. 10, 2000). However, Defendants failed to object to Beevers as an expert witness. Further, other evidence, discussed below, validates Beevers' contention that enough pages were created to produce more than 12,000 magazines. Thus, Pre–Press's failure to qualify Beevers as an expert witness is of no moment in this matter.

sheets were delivered by truck—by Pre–Press's independent shipper—and accompanied by a packing slip. The packing slip indicates that the pages were received on October 2, 2002 ("10–2–02") at 12:35 p.m. ("12:35") and bears the signature of the Booklet employee who accepted the shipment. Pre–Press's Ex. & Witness List, Ex. B.

Defendants concede that the magazine pages were delivered on October 2. However, they contend that Pre–Press took the pages back and redelivered them on the following day, only after Defendants had executed the Agreement. Powell testified at trial that the magazines required 48 hours of "drying time" and that, therefore, they had to arrive at Booklet by October 2, in order to be bound and delivered by October 4. She further testified that when she arrived at the bindery on October 3 at 4:00 p.m., there was not a single copy of the magazine bound and ready. According to Powell, the Booklet employees claimed that they had "just gotten the sheets" and were in the process of gluing them at that time. Despite Defendants' allegation that Pre–Press removed the pages from Booklet's premises, Morena asserted just the opposite, stating in no uncertain terms that the pages brought to Booklet were never subsequently removed by Pre–Press.

In sum, the preponderance of the evidence in this matter establishes that Pre–Press created enough pages for the production of 12,000 magazines and that those pages were delivered to Booklet by 1:00 p.m. on October 2, 2002. Accordingly, the Court finds that Pre–Press met its obligations under the Agreement. Moreover, as Pre–Press has established all of the elements needed to prove its claim, the Court finds in favor of Pre–Press on its complaint for both breach of contract and enforcement of guaranty against Powell and Bonner.

## C. Mitigation of Damages

As one of their affirmative defenses, Defendants assert that Pre–Press failed to mitigate its damages. Answer at p. 8. "The doctrine of mitigation of damages requires the non-breaching party to exercise reasonable diligence to avoid its losses." *Munoz v. Expedited Freight Sys., Inc.*, 775 F.Supp. 1181, 1190 (N.D.Ill.1991). If a party allows its damages to be unnecessarily increased, the loss that was avoidable by the performance of the party's duty falls upon that party. *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill.App.3d 254, 66 Ill.Dec. 902, 443 N.E.2d 1065, 1068 (Ill.App.Ct.1982) (citations omitted). "In other words, losses which could have been reasonably avoided are not recoverable." *St. George Chi., Inc. v. George J. Murges & Assocs., Ltd.*, 296 Ill.App.3d 285, 230 Ill.Dec. 1013, 695 N.E.2d 503, 509 (Ill.App.Ct.1998) (citations omitted).

Defendants bear the burden of establishing that Pre–Press failed to mitigate its damages. *See Riv Vil*, 979 F.Supp. at 660 (citation omitted). However, they have done no more than assert mitigation as an affirmative defense in their answer. As Defendants have not presented evidence from which the Court can conclude that Pre–Press failed to mitigate its damages, that affirmative defense fails.

## D. Defendants' Counterclaim

Defendants have filed a counterclaim for breach of contract against Pre–Press. They contend that Pre–Press breached the Agreement by failing to deliver all 12,000 magazines to Booklet, by failing to provide Defendants with an immediate refund of their earnest money, and by generally failing to perform "in a

good and workmanlike fashion consistent with customary standards of quality."

According to the Agreement, Pre–Press was required to immediately return Defendants' earnest money deposit of $1,000.00 "[i]f the Magazines [were] not delivered to Booklet as specified" in the contract. Compl., Ex. A, Agreement, at p. 2. As discussed above, the Court has found that Pre–Press fulfilled its contractual obligations by delivering in a timely manner to Booklet a sufficient number of pages for the production of 12,000 magazines. Thus, Pre–Press was not required to provide Defendants with a refund of their deposit.

Defendants' blanket claim that Pre–Press failed to perform competently is equally without merit. Defendants base their allegation on the following sentence of the Agreement: "The services of Seller [ (Pre–Press) ] hereunder shall be performed in a good and workmanlike fashion consistent with customary industry standards of quality." *Id.* Notwithstanding Defendants' sweeping contention, the evidence establishes that Pre–Press did, in fact, ably perform the printing services that it had agreed to provide under the contract. Indeed, the problem with the magazines arose from the binding of the pages into the finished product, not from the printing of the individual pages themselves.

Both Powell and Bonner testified at trial that the defect associated with the finished magazine was that the pages fell out. Booklet employee Morena substantiated Defendants' complaint by testifying that the spines of the magazines broke when Defendants looked through them and that the pages of any magazine will fall out if the spine is broken. Morena further testified that a seam was visible upon opening the first page of the magazine. Finally, Bonner testified that shortly after the books were distributed, Defendants received a "flood" of e-mail messages and telephone calls from people who said that the pages of their magazines had fallen out.

The parties do not dispute the fact that the finished magazines were improperly bound. However, neither Powell nor Bonner had any complaints about the visual appearance of the pages. Bonner even testified that she had gone to Pre–Press for various press checks and that she subsequently approved the pages that she saw.

Beevers testified that Pre–Press had nothing to do with the finishing of the magazines. Indeed, under the written Agreement, Pre–Press was not required to bind the pages, and, according to Beevers, the company is not even familiar with the gluing process. While the Court can sympathize with Powell and Bonner's anger, disappointment, and frustration with the finished product that they worked so hard to create, Defendants have taken aim at the wrong party by naming Pre–Press as the counter-defendant. Pre–Press performed its contractual obligations fully and competently. Accordingly, Defendants' counterclaim is dismissed.[10]

## IV. CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of Pre–Press, dismisses Defendants' counterclaim, and concludes that Defendants owe Pre–Press the aggregate sum of $38,467.00, the

---

10. At trial, Defendants testified at length about the consequential damages they incurred as a result of Pre–Press's breach of contract. They allege that these damages include lost subscription revenue and lost good-will. *See* Counterclaim at ¶ 7. As Defendants have been unable to prove that Pre–Press failed to perform under the Agreement, the Court need not further address the issue of damages.

amount due and owing under the written Agreement.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### ORDER

For the reasons set forth in a Memorandum Opinion dated the 22nd day of June 2004, the Court enters judgment in favor of Pre–Press Graphics Company, Inc., dismisses the counterclaim of Brides Noir, LLC, Dana Powell and Shannon Bonner, and orders Brides Noir, LLC, Dana Powell and Shannon Bonner to pay Pre–Press Graphics Company, Inc. the aggregate sum of $38,467.00, the amount due and owing under the relevant contractual agreement.